616 A.2d 866

**Leon A. ROSENBERG**

v.

**Ronald R. HELINSKI.**

**No. 25, Sept. Term, 1992.**

Court of Appeals of Maryland.

Dec. 14, 1992.

Motion for Reconsideration Denied Jan. 20, 1993.

666

William F. Ryan, Jr. and Howard R. Feldman (A. Thomas Pedroni, Jr., Whiteford, Taylor & Preston, on brief), Baltimore, for petitioner.

Herbert Burgunder, Jr. (Horn and Bennett, P.A., on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

We granted certiorari in this defamation action to consider whether a psychologist, whose expert in-court testimony in a child custody matter supported the wife's accusation that her husband had sexually abused their child, is privileged to reiterate the substance of his testimony to journalists waiting for him outside on the courthouse steps.

I

This case implicates the volatile mix of a father's personal reputation, the specter of child sexual abuse, the ubiquitous eye of television, the limits of free speech, and the privileged status accorded to reports of events in court. The dispute in question arose seven years ago in the midst of rancorous divorce and child-custody proceedings involving

the Respondent, Ronald Helinski; his wife, Jacqueline Garner Helinski; and their infant daughter, Jackie.

### A. *The underlying domestic litigation*

The Helinskis sought to end their marriage of some five years. At a hearing held on July 26, 1985, before the Circuit Court for Baltimore County (Jacobson, J.), Mrs. Helinski opposed her husband's request for unsupervised visitation with the child, who was then two years old. She alleged that Mr. Helinski had previously sexually abused their daughter. The mother offered as part of her evidence the opinion of expert witness Dr. Charles Shubin, a pediatrician at Baltimore's Mercy Hospital, who testified that his examination of Jackie had revealed a well-healed scar within the child's genitalia. Shubin asserted that the scar was characteristic of, and diagnostic of, a sexual injury.

The trial court granted the parties a divorce, and permitted Mr. Helinski rights of unsupervised visitation with his daughter. It said:

"I do not believe Mr. Helinski has demonstrated in any way he is the kind of man that is going to do these terrible things to his own child. I don't know what is behind all of this, but I do not believe that he is guilty of ... any child abuse of his two year old child; and I will not deprive him of the opportunity to visit with that child."

The trial court stated that while it could not explain the origin of the scarring described by Dr. Shubin, it found no connection between the injury and Mr. Helinski's conduct.

Mrs. Helinski immediately filed a motion to amend the visitation provisions of the divorce decree. She also denied her ex-husband access to the child, which prompted him to petition the trial court to hold the mother in contempt for violating the visitation order. Thereafter, on August 20, 1985, the Helinskis appeared once more before the Circuit Court for Baltimore County where Mrs. Helinski repeated her suspicions of child abuse as justification for defying the court order. She proffered the testimony of Petitioner

Leon Rosenberg, Ph.D., child psychologist and associate professor of medical psychology and pediatrics at Baltimore's Johns Hopkins University School of Medicine, whom Mrs. Helinski had consulted in the interim between the two hearings. The trial court then, in effect, reopened the hearing of July 26 in order to reconsider the question of visitation, and thereby addressed for a second time the allegations of sexual abuse along with the new issue of contempt.

Rosenberg testified that the diagnosing physician, Dr. Shubin, had referred Mrs. Helinski and Jackie to him. He stated that he had evaluated Jackie three times in all, first alone with Jackie, and twice more in the company of the mother. During the first interview, Rosenberg said, he engaged the child in conversation, observed her gestures towards her private parts, and the two together made drawings on paper to allow the child an additional way to refer to the parts of her body. He testified that by these methods he elicited from Jackie that she feared her father because he had hurt her in the genital area, and that she was afraid to see her father out of anxiety that he might hurt her there again. Rosenberg opined that the youngster's presentation had been honest and spontaneous, without coaching by the mother or another adult. Calling the contents of the interview "extremely clear," the psychologist concluded that the child had undergone a painful and frightening experience involving sexual abuse by her father.

Rosenberg said that his evaluation included a family history taken from Mrs. Helinski, the mother's accounts of Jackie's behavior arousing suspicion of abuse, the medical report of Dr. Shubin, a telephone conversation with Shubin regarding that report, and a telephone conversation with a Child Protective Services social worker, Martin Piepoli, who had earlier interviewed the child using anatomically correct dolls, with reference to which Jackie had indicated that her father had hurt her in the genital region. Rosenberg acknowledged that he never spoke with Mr. Helinski before

reaching his conclusions. He conceded, too, that he had known from the outset that the trial court at the July 26 hearing had found no evidence of abuse by the father.

Testifying that unsupervised visits posed a danger to the child, Rosenberg recommended that they be suspended until Mr. Helinski received psychological examination and counseling, which might then lead to supervised visits. Stating that it was not convinced that the father had caused the child's sexual injury, but that some danger existed, the trial court ordered psychiatric evaluations of both Mr. and Mrs. Helinski, with a ruling on visitation to await the results; the court further granted Mr. Helinski's request that Jackie be examined by a child psychologist of his own choosing. The rest of the August 20 hearing dealt with procedural matters and with Mrs. Helinski's alleged contempt of court.[1]

## B. The instant litigation

Newspaper reporters attended the August 20 hearing, as did a television artist who made sketches of the parties, the presiding judge, and Dr. Rosenberg in anticipation of their later use for media purposes. When the hearing ended, Rosenberg left the courthouse. He was met at the courthouse steps by a television camera crew and a T.V. newswoman, Ann Kellan, representing the Baltimore A.B.C. affiliate station WJZ, who undertook to ask him questions about the case.[2]

The record does not preserve their conversation in its entirety. It does, however, contain three short passages, or T.V. film "sound-bites," that were extracted from that conversation and made part of WJZ's news stories about

1. The domestic litigation between Mr. and Mrs. Helinski continued almost three more years, with issues not relevant here twice reaching the Court of Special Appeals for resolution in unreported opinions.

2. Rosenberg stated in his deposition that he and Judge Jacobson left the courthouse together. He recounted that Judge Jacobson responded to the journalist's questions by saying, "No, I can't speak, but the doctor can" before the two men parted company.

the hearing. The more comprehensive story ran during that evening's six o'clock newscast. Some 2 minutes and 15 seconds in length, the story identified the Helinskis by name, incorporated the artist's sketches, recapitulated the mother's allegations and Dr. Rosenberg's confirmation of them, and summarized the court's rulings.[3] Interspersed throughout the story were the three passages showing Rosenberg as he spoke to the television camera, which we now set forth verbatim:

"The child talked very directly about being hurt by her father and she talked about being hurt by her father in the genital area.

"And when she finally talked about being hurt, she expressed real fear, real anxiety, and two-and-a-half year old child[ren] cannot playact that well. It's beyond them.

"Whatever did occur was frightening, but it looked like it was time-limited and I think we have a very good chance of, ah, overcoming any negative effects."

These remarks to the camera on the courthouse steps essentially corresponded to the substance of Rosenberg's testimony during the hearing. A shorter version of the story, running 40 seconds in length and featuring only the first of Rosenberg's statements, ran during that evening's 11 o'clock newscast on WJZ.

Mr. Helinski sued Dr. Rosenberg in the Circuit Court for Baltimore City on August 15, 1986, for defamation. He pleaded that Rosenberg's statements were false, defamatory on their face in imputing to the father the crime of child

---

3. Petitioner Rosenberg's brief in this Court contains a purported written transcription of the news story as broadcast by WJZ. A video copy of the news story is included in the record as an exhibit, which we have viewed, and compared to Rosenberg's version as outlined in his brief. Rosenberg's transcription fails to indicate that the news report clearly identified both Mrs. and Mr. Helinski by name. By suggesting that the parties remained anonymous in the newscast, the transcript portrays a far more benign injury to the father's reputation than actually materialized. In reality, the newscast depicted Mr. Helinski's appearance via the artist's sketch and broadcast his full name in connection with child sex abuse charges.

sexual abuse, and made either negligently or maliciously. Rosenberg answered with a general denial of liability, and interposed the affirmative defense that the statements enjoyed either an absolute or a qualified privilege that would defeat the complaint. Prior to trial, Rosenberg filed a motion for summary judgment pursuant to Maryland Rule 2–501.

The court (Byrnes, John Carroll, J.), after a hearing, granted Rosenberg's summary judgment motion on December 13, 1990. Judge Byrnes first determined that Rosenberg's comments were protected by the privilege given to those who recount in-court testimony. He said:

"[Rosenberg] was not providing an opinion to the reporter, since that was not requested; but rather a restatement of opinion testimony. Nor was he presenting an 'idea' of his, something in the intellectual firmament for the public to chew on and pass around in the marketplace of ideas; but merely recounting what he had already said in a public, and privileged, forum. What he recounted was not false. It was true history even though it included, by implication ... his opinion or belief that what the child said was acceptable to him clinically as true.

\* \* \* \* \* \*

"... Here what persuades the Court in the final analysis is that you have a professional called into Court to speak about a matter. He does so truthfully, to his best professional judgment, a judgment which the Court in part accepted. He then is merely asked by a reporter in effect 'What did you say' and he responds with what he said and believed based upon, not accusations of another person, but upon his own evaluation, an evaluation which could not be made false, merely because Judge Jacobson was not convinced in a judicial tribunal, that Mr. Helinski did not do what he was accused of doing."

Judge Byrnes next concluded that there was no evidence that Rosenberg acted with malice, or had reason to know that his statements were false, or spoke with reckless disregard for the truth concerning the child's statements to

him and his own testimony. Finally, the trial court found no evidence of negligence on Rosenberg's part. Judge Byrnes observed that the psychologist's remarks at the T.V. interview matched his testimony at the hearing. He said: "It is virtually stipulated in the case that what he [Rosenberg] said he said, he did say." Judge Byrnes held, too, that as a matter of law Rosenberg could not be found negligent in evaluating Jackie and reaching his diagnosis of abuse by the father. In this regard, the trial court refused to admit the proffered evidence of Mr. Helinski's expert witness, forensic psychologist Dr. David Shapiro, who challenged the thoroughness of Rosenberg's evaluation. The court found that Shapiro, by his own admission, had no expertise in the field of child sexual abuse examinations.

The Court of Special Appeals reversed the summary judgment and remanded the case to the circuit court for further proceedings. *Helinski v. Rosenberg*, 90 Md.App. 158, 600 A.2d 882 (1992). It first held that Judge Byrnes erred in ruling, as a matter of law, that the forensic psychologist, Dr. Shapiro, was unqualified to testify as to the invalidity of Dr. Rosenberg's technique in evaluating Jackie. *Id.* at 170, 600 A.2d 882. It turned next to the question of privileged statements. Referring to the *Restatement (Second) of Torts* § 611 (1977), which treats reports of official proceedings or public meetings, the intermediate appellate court observed that while a privilege to defame exists for accurate reports of in-court testimony, it is not settled whether the privilege extends to "self-reported" remarks; that is, it is uncertain to what extent, if any, one can make defamatory statements in a privileged forum and then repeat them to others beyond that forum. *Id.* at 172–73, 600 A.2d 882. The court further held that a self-report privilege would apply unless the person repeating his own defamatory statements acts with the intention of causing harm to another. *Id.* at 174–75, 600 A.2d 882. The Court of Special Appeals thus implicitly directed the circuit court, upon remand, to examine more closely the question

of whether Dr. Rosenberg acted with such a harmful intention when he spoke to the television news reporter.

We granted Rosenberg's certiorari petition. He asks that we reverse the judgment of the intermediate appellate court and reinstate the judgment of the Circuit Court for Baltimore City. He argues, *inter alia*, that the Court of Special Appeals permitted the question of negligence, by way of the disputed expert testimony, to intrude into a sphere of common and constitutional law that requires the presence of malice before it will recognize an actionable wrong, and that no malice is present here. He offers three independent theories triggering a malice standard: 1) that his statements were subject to the so-called fair report privilege; 2) that his statements addressed a matter of public concern, child abuse; or 3) that his statements discussed a person, Mr. Helinski, so steeped in controversy as to be a public figure. There is no need to reach the second and third of these points. Believing that Dr. Rosenberg's comments on the courthouse steps were legally privileged, we shall reverse.

## II

A trial court may grant summary judgment when pretrial documents show that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Maryland Rule 2-501(e). In reviewing a disposition by summary judgment, an appellate court will consider primarily whether a factual dispute exists, and in so doing resolve all inferences against the party making the motion. *McDermott v. Hughley*, 317 Md. 12, 22, 561 A.2d 1038 (1989); *Beard v. American Agency*, 314 Md. 235, 246, 550 A.2d 677 (1988). The standard for appellate review of a trial court's grant of summary judgment is whether the trial court was legally correct, since a trial court decides issues of law, not fact, when granting summary judgment. *Heat & Power v. Air Products*, 320 Md. 584, 591-92, 578 A.2d 1202 (1990); *Lynx, Inc. v. Ordnance Products*, 273 Md. 1, 8, 327 A.2d 502 (1974).

 To recover for defamation, a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm. *Hearst Corporation v. Hughes*, 297 Md. 112, 120–125, 466 A.2d 486 (1983); *see Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976).

 It is unnecessary to draw nice distinctions in deciding whether Rosenberg's oral comments made to a television news camera and recorded on film for broadcast constituted libel or slander; the tort at hand is the tort of defamation. *See Hearst, supra*, 297 Md. at 118, 466 A.2d 486; Laurence H. Eldredge, *The Law of Defamation* § 13 (1978) (adopting the term "defamacast"). A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person. *Batson v. Shiflett*, 325 Md. 684, 722–23, 602 A.2d 1191 (1992). Rosenberg's three statements to the television reporter, taken in the aggregate, were defamatory in nature. Even though his comments to some extent reconveyed the daughter's own remarks, the psychologist, in effect, labeled Mr. Helinski a child sex abuser; he repeated the child's allegations and then declared that the child's fear and anxiety of further abuse were genuine. Rosenberg thus branded Helinski as a man who committed an act reviled by society, which also constitutes a felony. *See* Maryland Code (1957, 1992 Repl.Vol.) Art. 27, § 35A.

For the purpose of our analysis, we accept the well-pleaded allegations of Helinski's complaint as true, as well as Judge Jacobson's original finding that no evidence at the first hearing linked Jackie's genital scarring to any conduct by her father. Moreover, we shall assume, without deciding, that Rosenberg acted negligently in evaluating Jackie and in communicating the results of his examination. We accept Helinski's position that accusations of child abuse, by

their very nature, inflict grave harm to one's reputation. Nevertheless, the statements in question here are not actionable. Given the circumstances in which he spoke, Rosenberg enjoyed a legal privilege to defame.

### III

#### A. Absolute privilege

██ It is well settled in Maryland that statements made by a witness during the course of judicial proceedings are absolutely privileged, and therefore cannot serve as the basis for an action in defamation. *Odyniec v. Schneider,* 322 Md. 520, 526, 588 A.2d 786 (1991); *Miner v. Novotny,* 304 Md. 164, 170, 498 A.2d 269 (1985); *Adams v. Peck,* 288 Md. 1, 3, 415 A.2d 292 (1980); *Korb v. Kowaleviocz,* 285 Md. 699, 704, 402 A.2d 897 (1979). This absolute privilege protects the witness from liability even if his motive was malicious, he knew the statement was false, or his conduct was otherwise unreasonable. *Odyniec, supra,* 322 Md. at 527, 588 A.2d 786; *Adams, supra,* 288 Md. at 3, 415 A.2d 292; *Maulsby v. Reifsnider,* 69 Md. 143, 164, 14 A. 505 (1888). The privilege remains absolute whether the defamatory statements be relevant or irrelevant to the subject matter of the proceedings. *Odyniec, supra,* 322 Md. at 527, 588 A.2d 786; *Korb, supra,* 285 Md. at 704, 402 A.2d 897.

The rationale for such an absolute privilege has long been recognized. More than a century ago, we acknowledged "the great importance to the administration of justice that witnesses should testify with minds absolutely free from the apprehension of being annoyed by civil actions for any thing they may say as witnesses." *Hunckel v. Voneiff,* 69 Md. 179, 198, 14 A. 500 (1888). Public policy, *i.e.* the public interest in free disclosure of evidence leading to a determination of truth, requires that those who participate in the judicial process must be able to do so without being hampered by the fear of private suits for defamation. *Adams, supra,* 288 Md. at 5, 415 A.2d 292. *See* 2 Fowler V. Harper

et al., *The Law of Torts* § 5.22 (2d ed. 1986). Because of the need for witnesses to speak freely in court, without intimidation by the possibility of civil liability, an individual's right to redress for defamation is necessarily curtailed. *Odyniec, supra*, 322 Md. at 528, 588 A.2d 786; *McDermott, supra*, 317 Md. at 23–24, 561 A.2d 1038; W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 114 (5th ed. 1984).

▌ In light of the foregoing authorities, all of Rosenberg's testimony at the hearing of August 20, 1985, in which he articulated his investigatory methods and his conclusion that Mr. Helinski had sexually abused Jackie, was privileged. His statements in court are immune from suit.

### B. Qualified or special privilege to report judicial proceedings

▌ Operating in tandem with the absolute privilege accorded participants in court proceedings is a lesser privilege, alternatively described as qualified, conditional, or special, given to persons who report to others defamatory statements uttered during the course of judicial proceedings. Again, the applicable Maryland law has long been settled. Reports of in-court proceedings containing defamatory material are privileged if they are fair and substantially correct or substantially accurate accounts of what took place. *McBee v. Fulton*, 47 Md. 403, 417, 426 (1878); *Evening News Co. v. Bowie*, 154 Md. 604, 610–11, 141 A. 416 (1928); *Brush–Moore Newsp. v. Pollitt*, 220 Md. 132, 138, 151 A.2d 530 (1959); *Piracci v. Hearst Corporation*, 263 F.Supp. 511, 513 (D.Md.1966), *aff'd*, 371 F.2d 1016 (4th Cir.1967); *Yerkie v. Post–Newsweek Stations, Michigan*, 470 F.Supp. 91, 93 (D.Md.1979); *Batson, supra*, 325 Md. at 727, 602 A.2d 1191.

▌ Generally speaking, qualified or conditional privileges in defamation cases are forfeited only upon a showing of actual malice; that is, a defendant who makes state-

ments with knowledge of their falsity or with reckless disregard for the truth is not protected. *Batson, supra,* 325 Md. at 733, 602 A.2d 1191; *Marchesi v. Franchino,* 283 Md. 131, 139, 387 A.2d 1129 (1978). Since enunciating in *Marchesi* the actual malice standard as it applies to the conditional privileges invoked in other settings, typically employment decisions and credit references, this Court has not been presented with a case involving privileged reports of judicial proceedings. Our early cases suggest that such a qualified privilege operates only when the report is fair, accurate, and made without malice. *See, e.g., McBee, supra,* 47 Md. at 426; *Bowie, supra,* 154 Md. at 610, 141 A. 416. *See also Restatement of Torts* § 611(b) (1938) (protection lost if report is published solely for the purpose of harming the person defamed). The modern view regards the reporting of judicial proceedings as protected by a so-called special privilege that is, while not absolute, somewhat broader in its scope than other conditional privileges. *See Restatement (Second) of Torts* § 611, comment a (1977). The modern view discards the search for malice, and requires simply that the report be fair and substantially correct, *Brush–Moore Newsp., supra,* 220 Md. at 138, 151 A.2d 530; *Yerkie, supra,* 470 F.Supp. at 93, or, in the language of the *Restatement,* "accurate and complete or a fair abridgement of the occurrence reported." *Restatement (Second) of Torts* § 611. Under the modern view, the privilege exists even if the reporter of defamatory statements made in court believes or knows them to be false; the privilege is abused only if the report fails the test of fairness and accuracy. *Id.*

We need not express a preference for either the traditional or modern view in the case before us. The record is barren of any evidence suggesting that Dr. Rosenberg acted maliciously in evaluating Jackie and subsequently reporting his conclusions to the court and the television news team. His professional training and experience of 20 years indicated to him that Jackie had suffered abuse. Nothing suggests that the psychologist knew his own con-

clusions to be false, or reached them with a reckless disregard for the truth. To the contrary, he testified that he had been alert to the possibility that the child had been coached, and that he had considered corroborating factors, such as the physician's report and the social worker's report, which were consistent with a diagnosis of abuse. Helinski did not challenge Rosenberg's credibility on these points.

We do not accept Helinski's conclusion that the July 26 hearing, at which Judge Jacobson found no connection between Helinski and the child's genital injury, established the truth, thereby rendering Rosenberg's professional opinion false, and his conduct malicious, for the purposes of a defamation action. Judge Jacobson expressly revisited the question of sexual abuse at the August 20 hearing. By implication, the truth of this matter before the trial court remained an open question demanding a further inquiry, in which Rosenberg was permitted to offer new evidence. We find no trace of malice here.

■ The special protection given to fair and accurate reports of judicial proceedings rests on a fundamental premise: " 'A trial is a public event. What transpires in the court room is public property.... Those who see and hear what transpired can report it with impunity.' " *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975) (quoting *Craig v. Harney,* 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947)). Any one of three theories may serve as a rationale for granting a privilege to such reports of events in court: (1) the agency rationale, by which the reporter acts as agent for an otherwise preoccupied public which could, if it possessed the time, energy or inclination, attend the proceeding; (2) the public supervision rationale, by which the reporter provides to the larger community data it needs to monitor government institutions; (3) or the public information rationale, by which the reporter provides information affecting the greater public welfare. *Reuber v. Food Chemical News, Inc.,* 925 F.2d 703, 713 (4th Cir.1991) *en banc, cert. denied,* —— U.S. ——, 111 S.Ct. 2814, 115

L.Ed.2d 986 (1991); *Medico v. Time, Inc.*, 643 F.2d 134, 140–42 (3rd Cir.1981), *cert. denied*, 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981). *See* David A. Elder, *The Fair Report Privilege* 3–4 (1988). While each of these theories might arguably serve in this case, the agency rationale is clearly applicable. Rosenberg acted as a conduit between the courtroom and the world at large. He recounted events at a judicial hearing, entirely open to the public, that any members of the community might have seen and heard for themselves.

While the fair report privilege usually arises in lawsuits involving the press or electronic media, it is not limited to defendants in the news business. The privilege extends to protect reports of judicial proceedings made by other persons as well. *McBee, supra,* 47 Md. at 417; *Seymour v. A.S. Abell Co.,* 557 F.Supp. 951, 955 (D.Md. 1983); *see Restatement (Second) of Torts* § 611, comment c (privilege extends to any person who makes an oral, written or printed report to pass on the information that is available to the general public); Eldredge, *Law of Defamation* at 421; Elder, *Fair Report Privilege* at 169. As the public's interest in obtaining reports of court matters remains the same irrespective of the reporter's identity, Rosenberg may invoke the privilege. That he may do so is consistent with the principle that the law generally treats journalists and non-journalists alike in the context of defamation actions. *See Dun & Bradstreet, Inc. v. Greenmoss Builders,* 472 U.S. 749, 773, 105 S.Ct. 2939, 2952, 86 L.Ed.2d 593 (1985) (White, J., concurring) (First Amendment gives no more protection to the press than it does to others exercising their freedom of speech); *id.* at 784, 105 S.Ct. at 2958 (Brennan, J., dissenting) (the rights of institutional media are no greater and no less than those enjoyed by other individuals or organizations); *Negley v. Farrow,* 60 Md. 158, 177 (1883) (proprietor of newspaper entitled to no privilege not possessed by the community in general).

The instant case thus turns primarily on the fairness and accuracy of Rosenberg's comments to the camera. Of his

statements' accuracy there can be no doubt. Rosenberg insists, Helinski concedes, and we agree that the psychologist's three remarks on the courthouse steps essentially repeated what he had said earlier as a witness during the hearing itself. He told the television newspeople that Jackie had discussed being hurt in the genital area by her father; that her fear and anxiety resulting from the hurtful episode were genuine; that young children cannot convincingly simulate such fear and anxiety; that the frightening episode was limited in time; and that the child had a good chance of overcoming her psychological distress. The transcript of the August 20 hearing makes clear that Rosenberg, using a similar vocabulary and often adopting a similar tone, had offered the very same observations on the witness stand. If anything, parts of his witness testimony were phrased somewhat more emphatically in connecting Helinski to sexual abuse of the child.

We must next consider the fairness of Rosenberg's report of the events that took place during the hearing in court. Here the *Restatement* offers a useful guide:

"Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it."

*Restatement (Second) of Torts*, § 611, comment f. Helinski asserts that Rosenberg's report fails the test of fairness. He contends that Rosenberg additionally should have reported that the trial court found Mrs. Helinski in contempt, ordered further psychological evaluations of the domestic parties, and considered Helinski "innocent" of abusing Jackie. We disagree.[4]

---

**4.** It should be noted that the record does not suggest whether Rosenberg touched on these additional matters in his conversation with WJZ's Ann Kellan. All that survives is the final videotape of the news

The fair reporting privilege reaches not only comprehensive accounts of judicial proceedings, but accounts focusing more narrowly on important parts of such proceedings. *See, e.g., Bowie, supra,* 154 Md. 604, 141 A. 416 (report of judge's charge to grand jury); *Rushford v. New Yorker Magazine, Inc.,* 846 F.2d 249, 254 (4th Cir.1988) (report of cross-examination testimony and bench conference); *Ricci v. Venture Magazine, Inc.,* 574 F.Supp. 1563, 1565–67 (D.Mass.1983) (report that accused threatened witness in courtroom); *The Savage Is Loose Co. v. United Artists, Etc.,* 413 F.Supp. 555, 560–561 (S.D.N.Y.1976) (report of allegations made in a complaint); *Mark v. Seattle Times,* 96 Wash.2d 473, 635 P.2d 1081 (1981), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982) (reports based on criminal information and affidavit of probable cause).

Rosenberg's testimony constituted a major portion of the hearing before Judge Jacobson. His testimony related to both the visitation order and the contempt motion pending before the trial court. The transcript of his testimony is 50 pages long. Mrs. Helinski, the only other witness at the hearing, answered four questions on direct examination and was then briefly questioned by the court before undergoing a short cross-examination; her testimony's transcript is 6 pages long. Rosenberg's comments to the T.V. crew, then, addressed the most significant substance of the hearing. His report was not unfair in respect to what he said.

Nor do we find Rosenberg's statements unfair in respect to what he did not say. His out-of-court comments reporting his own testimony, to the exclusion of other matters, did not result in a materially misleading account of the hearing. The other aspects of the hearing were collateral to the defamatory gist of his report. The trial court's decision to hold Mrs. Helinski in contempt sprang from her defiance of a court order. The ruling existed apart from Rosenberg's testimony identifying Helinski as a child abuser; and the

story as broadcast. Any other statements preserved on tape presumably wound up on the editing room floor.

contempt citation of the mother certainly did not lessen the defamatory sting of that testimony. Indeed, a report of the mother's motives for inviting the court's displeasure—her wish to protect Jackie from further abuse—might have multiplied the damage to Helinski's reputation.

Judge Jacobson's order that both of the Helinskis undergo psychological testing did not exculpate the father from the charges leveled against him. The ordinary person would understand the order to be part of the trial court's efforts to evaluate the emotional health and stability of the parties before venturing to devise a visitation schedule. A report that the father's visitation rights had been suspended pending the outcome of the tests would only have confirmed the inherently defamatory message that he posed a danger to the child.

Finally, Rosenberg had no duty to report that the trial court believed Helinski innocent of child abuse. Such a report would have been incorrect. The trial court at the August 20 hearing expressly reopened the July 26 hearing, and amended its earlier order. Judge Jacobson stated at the second hearing that he was not convinced that Helinski had caused Jackie's sexual injury. The court declared it did not know the source of Jackie's injuries. It described Rosenberg's testimony as "very potent." Judge Jacobson then suspended the father's visitation rights and ordered that he be evaluated by a psychologist. The judge largely adopted Rosenberg's recommendations as to future steps. The court noted that some danger to the child existed, and that it could not predict whether Helinski would be permitted to reestablish a parental relationship with the girl. These many factors reveal a trial court judge searching prudently and even-handedly for the truth. They hardly represent a judicial finding of innocence.

In sum, the parts of the hearing which Rosenberg did not address were of little or no consequence to the defamatory import of his statements to the T.V. camera. His choices regarding what to say and what to leave unsaid were those "reasonably to be expected in abbreviation" of the entire

proceeding. *Pulvermann v. A.S. Abell Co.,* 228 F.2d 797, 803 (4th Cir.1956). His synopsis of the hearing was fair in that "the overall impression created by the summary was no more defamatory than that created by the original." *Brown & Williamson Tobacco Corp. v. Jacobson,* 713 F.2d 262, 270 (7th Cir.1983). As we see it, a fuller report would not have somehow evened the score between harm and rehabilitation materially affecting Helinski's reputation. Rosenberg accurately and fairly reported his witness testimony.

### C. The self-reported statement exception

The *Restatement* commentary adds one final reservation to the fair reporting privilege: "A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not." *Restatement (Second) of Torts* § 611, comment c. At first blush, this comment would appear to apply to Rosenberg's situation, and defeat his claim to the privilege. Upon closer analysis of the pertinent authorities, however, we find that this exception does not apply in the instant case.

The question of privileged self-reported statements is one of first impression in this Court.[5] The *Restatement* offers no case law in support of its blanket denial of the privilege to those persons who report their own defamatory statements made during a court proceeding. The commentary

---

5. The Court came near to this question in the case of *Adams v. Peck, supra,* 288 Md. at 1, 415 A.2d 292. There, the defendant-psychiatrist sent a letter to a lawyer litigating a domestic dispute; the letter stated the psychiatrist's opinion that the plaintiff-father had abused one of his children and urged that all visitations stop. The letter to the attorney was deemed to be directly related to a judicial proceeding, and thus absolutely privileged. The Court then alluded to an allegation that the defamatory statement was published again in a non-privileged forum. *Id.* at 9, n. 2, 415 A.2d 292. Concluding that the issue of the second publication was not properly preserved for appellate review, we did not reach it.

quoted above does not appear in either of the two tentative draft versions of § 611 produced before the current, published text. *See Restatement (Second) of Torts* § 611 (Tentative Draft No. 20, 1974) and *id.* (Tentative Draft No. 21, 1975). The decision to include the commentary was made after a brief discussion at a meeting of the American Law Institute, during which one participant called the proposed comment "a flat contradiction of the black letter" law as set forth in § 611. *See* 52 A.L.I. Proceedings 188 (1976).

▪▪▪ The commentators and cases interpret § 611 as conferring protection upon any persons who do not act maliciously by commencing judicial proceedings in bad faith and then later repeating their own defamatory statements under the aegis of privilege. Professors Harper, James and Gray put it succinctly:

"The privilege should certainly not be recognized when the occasion for invoking it appears to have been fabricated. The defamer who makes the original statement in a privileged setting should not be shielded by a reporting privilege in repeating it himself outside that setting. Nor should the privilege be recognized for the reporting of statements that were made in spurious circumstances, devised primarily to provide a pretext for the claim of the privilege."

2 Harper et al., *Law of Torts* at 207–08. *See also* Elder, *Fair Report Privilege* at 171. We think this to be the better interpretation of the *Restatement;* the privilege will be forfeited only if the defamer illegitimately fabricated or orchestrated events so as to appear in a privileged forum in the first place. That is the true danger against which the self-reported statement exception must guard.

▪▪▪ This view is consistent with the relatively few cases dealing with self-reported statements. The Court of Appeals of New Mexico has observed that the exception is obviously intended to prevent abuse of the fair report privilege by, for example, a person who brings suit not with the aim of pursuing the purported legal objective, but to

cause harm to another by pleading or announcing defamatory matter in court and then using the protective shield of the privilege to republish the defamatory matter to the world. *Stover v. Journal Pub. Co.*, 105 N.M. 291, 731 P.2d 1335, 1339 (1985), *cert. denied*, 484 U.S. 897, 108 S.Ct. 230, 98 L.Ed.2d 189 (1987). The Supreme Court of Arizona has held that this exception to the fair report privilege envisions "the speaker who *by design* uses the privilege to republish defamation he previously made during the public proceeding." *Green Acres Trust v. London*, 141 Ariz. 609, 688 P.2d 617, 626 (1984) (emphasis added). The Court of Appeals of New York has determined that the state's statutory privilege does not protect a person who maliciously institutes a judicial proceeding alleging defamatory charges and then circulates a press release or other communication based thereon. *Williams v. Williams*, 23 N.Y.2d 592, 298 N.Y.S.2d 473, 477, 246 N.E.2d 333, 337 (1969).

 It is clear that the exception made for self-reported statements aims to deter those persons who, acting out of a corrupt defamatory motive, abuse the privilege accorded to fair and accurate reports of judicial proceedings. There is not the remotest indication in the record that Dr. Rosenberg sought in bad faith to testify at the domestic hearing with some perverse wish to harm Mr. Helinski afterwards by trumpeting defamatory matter to a television audience. To the contrary, he was engaged as an expert witness in the field of child psychology. He testified in that capacity, bound by his professional obligations to offer his best judgment. He had no personal stake in the outcome of the hearing. As he left the courthouse, he was approached by a T.V. news reporter and, in response to her questions, he then accurately and fairly recounted the substance of his testimony in court. In these circumstances, to deny the privilege to a witness reporting his own testimony, while the privilege is available to any other court spectator later recounting that same testimony, would defy logic.

IV

It should be acknowledged once more that Rosenberg's remarks to the television camera were defamatory in nature. However, those remarks conveyed a substantially fair and accurate report of the judicial hearing in which the psychologist had taken part as a witness. His statements thus enjoyed a qualified or special privilege protecting him from liability. For the reasons we have delineated, the law permits Rosenberg to tell others what happened in court that day. The public's right to know the business of its courts takes precedence in this case.

JUDGMENT REVERSED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.