12 A.3d 164

Nicholas A. PISCATELLI

v.

Van SMITH, et al.

No. 02838, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Jan. 27, 2011.

24

26

28

**30**

Peter A. Prevas (Prevas & Prevas, on the brief) Baltimore, MD, for appellant.

Peter F. Axelrad & Michael S. Steadman, Jr. (Council, Baradel, Kosmerl & Nolan, PA, on the brief) Annapolis, MD, for appellee.

Panel: EYLER, JAMES R., KEHOE and J. FREDERICK SHARER (Retired, Specially Assigned), JJ.

KEHOE, J.

On December 5, 2007, Nicolas A. Piscatelli, appellant, filed a complaint in the Circuit Court for Baltimore City against appellees, Van Smith, a reporter for City Paper, and CEGW, Inc., the owner of City Paper. The complaint alleged one count of defamation and one count of invasion of privacy/false

light. Appellees filed a motion for summary judgment which was granted on February 17, 2009.

Piscatelli appeals the grant of that motion and presents the following question for review, which we have reworded:[1]

Did the circuit court err in granting summary judgment on the basis that there no were material facts in dispute?

We answer the question in the negative and affirm the decision of the circuit court.

### FACTUAL AND PROCEDURAL BACKGROUND

On or about April 11, 2003, Jason Convertino, a manager of Redwood Trust, a Baltimore nightclub, and a friend, Sean Wisniewski, were murdered at Convertino's home in the Fells Point neighborhood of Baltimore. Piscatelli was a co-owner of the nightclub.

After a police investigation, Anthony Jerome Miller, a former security guard at Redwood Trust, was charged with both murders. While the case against him was pending in the Circuit Court for Baltimore City, on October 27, 2006, the State filed a supplemental discovery disclosure statement pursuant to Maryland Rule 4–263, which stated in pertinent part:

1. Pam Morgan [Convertino's mother] has stated that an unknown man approached her at a benefit in Binghamton, New York held for her son's child shortly after his murder. The man advised her that Nick Piscatelli was behind her son's murder, he covered his tracks & hired someone to kill him.

2. Ms. Morgan advised that Van Smith, reporter for City Paper, told her someone told him that he had heard Nick threaten to kill Jason.

---

1. Piscatelli phrases the issue as:
 Did the circuit court err in granting summary judgment in favor of the City Paper based upon the fair reporting privilege, a qualified privilege, where Piscatelli had generated an issue whether the qualified privilege had been abused which is a question of fact for the jury?

Piscatelli was a witness at Miller's trial and was examined by defense counsel as to his own possible motives for murdering Convertino, namely, that Piscatelli suspected Convertino of stealing money from the club and that Convertino was planning to leave the Redwood Trust to work for a competitor. On March 15, 2007, Miller was convicted of both murders and sentenced to two consecutive thirty year prison terms.

Smith wrote a series of articles in City Paper regarding the murders, the police investigation and Miller's trial. Piscatelli alleges that two of the articles, one published on December 6, 2006 and one on June 20, 2007, republished false and defamatory accusations that Piscatelli had been involved in the murders.

The December 6, 2006 article, headlined "Late Discovery, A New Twist in the Redwood Trust Double–Murder Case" (hereinafter "the December article"), quoted Smith's interview with Piscatelli, in which he denied any involvement in the murders. It also included the following relating to Smith's interview of Ms. Morgan:

> On Oct. 27, [Assistant State's Attorney Sharon] [2] Holback disclosed in a memorandum to the defense that "Pam Morgan [Convertino's mother] has stated that an unknown man approached her at a benefit in Binghamton, New York, held for her son's child shortly after his murder. The man advised her that Nick Piscatelli was behind her son's murder, he covered his tracks and hired someone to kill him." The memo does not indicate when Morgan shared this information with investigators, but she told *City Paper* during a Nov. 30 phone interview that the event was held in May 2003, just weeks after the murders.

> "At the benefit, this guy comes up to me and he says he knows who is behind my son's murder" Morgan recalls. "I didn't know Nick [Piscatelli] at that point." Since then,

---

2. The articles contain occasional parenthetical comments set off by brackets, i.e. "[ ]." To avoid confusion, we will underline as well as bracket our insertions.

though, Morgan says she has kept in regular, friendly phone contact with Piscatelli.

"Oh, boy! She said that?" Piscatelli says when informed of Morgan's statement about the man's visit to the Binghamton gathering. "That's unfortunate. I've spoken to her several times, and she's never mentioned anything like that to me. That's certainly sad to hear. There has been no animosity between us."

Over the phone from her home outside of Binghamton, Morgan describes the man who dropped Piscatelli's name at the benefit as white, in his 30s [sic], several inches shy of 6 feet, with "lightish, hair" of "medium build," and "wearing a long coat, like a trenchcoat."

He came in, talked, and left," she continues. "I was like, 'Whoa!' And that's when I first started questioning the club, and had these theories [that Piscatelli might be involved]. And I also thought, did [the unknown man] do it purposefully, to throw it off someone else by naming Nick? Because there is no evidence against Nick."

Still, she says she's fearful of Piscatelli, and now that her suspicions have been made public in Miller's case file she says she will stop calling him. "That was my last call to him, probably in September," Morgan recalls, when she says she discussed with Piscatelli items still in his possession that belonged to her son. (The memo also discloses that Morgan told investigators that this reporter shared with her information about Piscatelli obtained through unnamed sources).

After Miller was convicted of Convertino and Wisniewski's murders, Smith wrote another article on June 20, 2007, entitled "The Lonely Killer, Anthony Jerome Miller got Sixty (60) Years for a Double Murder, But Questions Still Remain Over Whether or Not He Acted Alone" (hereinafter the "June article"). The June article read, in pertinent part:

For a long time, Pam Morgan suspected that Nick Piscatelli had something to do with her son's death. Her radar went up early on, when she met with detective Blane

Vucci—the first lead investigator on the case—on her first visit to Baltimore, right after the murders in 2003. Morgan had thought of Piscatelli as nothing more than her son's employer prior to the murders. But she recalls that when she told Vucci that she thought that the murders must have something to do with Redwood Trust, "because if Jay knew anybody, it would have been through the business," Vucci's heated reaction surprised her.

"He informed me that Nick did everything for my son, yelling at me," Morgan says. "He told me there was no evidence, that the case would never be solved, and made it seem like somehow Jay did something wrong. And I left feeling hopeless." (Attempts to reach Vucci for comment were unsuccessful.)

Morgan went back to upstate New York, and began to investigate the case on her own. She went through her son's records that she had, calling any contacts she could find, and tried to share any information she developed with the Baltimore Police Department.

One of the things she shared with the police had to do with Piscatelli. About a month after the killings, in May 2003, a benefit was held near Binghamton to raise money for Convertino's young daughter. About 500 people showed up, and while it was going on, Morgan says she was approached by a man she'd never seen before and hasn't seen since. "He said that Nick Piscatelli was behind my son's murder," Morgan recalls, "that [Piscatelli had] hired someone to do it, and that he'd covered his tracks."

Since then, Morgan had kept Piscatelli close. She says she maintained a phone relationship with him, never letting on that she suspected his involvement.

\* \* \*

Morgan was not present when Piscatelli testified at Miller's trial—it was the first and only day of the trial she missed. Now that Miller's been convicted, she says she feels less certain about her suspicions than ever.

"If I knew Nick actually did it, if I actually had the proof" that he was somehow involved in Convertino's death, Morgan says, "I don't know what I would have done differently. As long as I still had a doubt and could speak to this man, I did so. So many other things are surfacing, and sometimes we are led to believe one thing when it is the opposite. Now, I have doubts that Nick is responsible. Before, I could go either way on this whole thing. But right now, it's like I don't know anymore.

Don't forget, she continues, "[the police] told me they felt two people were involved. And of course, I'm thinking, *Well somebody came [to the benefit] and told me that. Was he the second person?* Now, I don't know."

Or it might have been Miller, acting alone, killing two people simply to get a credit card and a laptop in order to pay for his honeymoon. If so, barring a successful appeal, Miller will be paying for that honeymoon for a long time to come.

(Emphasis in original.)

Piscatelli filed a complaint against appellees, alleging that the December Article and the June Article were defamatory, invaded his privacy and cast him in a false light by suggesting that he was involved in the two murders.

Appellees filed a motion for summary judgment, arguing that the articles were not defamatory, that they did not misstate facts and that the articles were wholly privileged. Piscatelli filed an opposition to the motion for summary judgment. The arguments advanced by the parties in support of, and in opposition to, the motion were essentially the same as those presented to this Court.

A hearing on the motion and Piscatelli's opposition thereto was held on January 26, 2009. On February 17, 2009, the circuit court issued an order granting appellees' motion for summary judgment on all counts of the complaint. Piscatelli filed a timely appeal from that judgment.

Additional facts will be discussed as necessary in this opinion.

**36**

ANALYSIS

(1)

 Appellate courts review the grant of a motion for summary judgment *de novo. Chesek v. Jones,* 406 Md. 446, 458, 959 A.2d 795 (2008); *Dashiell v. Meeks,* 396 Md. 149, 163, 913 A.2d 10 (2006). When there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law, the entry of summary judgment is appropriate. MD. RULE 2–501(f); *Pines Point Marina v. Rehak,* 406 Md. 613, 618, 961 A.2d 574 (2008).

██ Our first step is to determine whether there is a genuine dispute as to a material fact. *Harford County v. Saks Fifth Ave. Distribution Co.,* 399 Md. 73, 82, 923 A.2d 1 (2007); *United Servs. Auto. Ass'n v. Riley,* 393 Md. 55, 66, 899 A.2d 819 (2006). An issue of fact is material if its resolution will affect the outcome of the case in some way. *Riley,* 393 Md. at 67, 899 A.2d 819; *Robb v. Wancowicz,* 119 Md.App. 531, 536, 705 A.2d 125 (1998).

██ If we find that there is a genuine dispute of a material fact, then we must reverse the circuit court's grant of summary judgment. If we find that there is no genuine dispute of a material fact, we must then determine whether the moving party was entitled to judgment as a matter of law. *Myers v. Kayhoe,* 391 Md. 188, 203, 892 A.2d 520 (2006). Finally, in a defamation case such as this, we weigh the parties' contentions after making our own independent evaluation of the record in order to assure that a potential judgment against appellees would not infringe upon their right of free expression protected by the First Amendment of the United States Constitution and Article Forty of the Maryland Declaration of Rights. *Chesapeake Publishing v. Williams,* 339 Md. 285, 299, 661 A.2d 1169 (1995); *see Peroutka v. Streng,* 116 Md.App. 301, 308, 695 A.2d 1287 (1997) (Article Forty is to be treated *in pari materia* with the First Amendment.)

██ In the instant case, the circuit court's order granting summary judgment stated "that there is no genuine dispute of

material fact and that [appellees] are entitled to judgment as a matter of law," without further providing a basis for its reasoning. "In the absence of [a discussion of the trial court's reasoning as to why summary judgment was proper], we must assume that the circuit court carefully considered all of the asserted grounds and determined that all or at least enough of them as to merit the grant of summary judgment were meritorious." *Ross v. Am. Iron Works,* 153 Md.App. 1, 10, 834 A.2d 962 (2003). Under such circumstances, we can affirm the court's judgment if the record indicates that the circuit court did not err. *Smigelski v. Potomac Insurance Co.,* 403 Md. 55, 61, 939 A.2d 189 (2008); *Phillips v. Allstate Indem. Co.,* 156 Md.App. 729, 740, 848 A.2d 681 (2004).

 In order to place the parties' contentions in context, we will briefly review the most pertinent parts of Maryland's law of defamation. We begin with the elements of the cause of action. As Judge Andre Davis explained, in Maryland:

[I]n order to make out a prima facie case of defamation the plaintiff must allege that (1) the defendant made a defamatory communication, i.e., that he communicated a statement tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule to a third person who reasonably recognized the statement to be defamatory; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm.

*Agora, Inc. v. Axxess, Inc.,* 90 F.Supp.2d 697, 701 (D.Md.2000) (citing *Peroutka,* 116 Md.App. at 311, 695 A.2d 1287 and *Shapiro v. Massengill,* 105 Md.App. 743, 772, 661 A.2d 202, (1995)). In the context of defamation, a statement is false only when it is " 'not substantially correct' " *Batson v. Shiflett,* 325 Md. 684, 726, 602 A.2d 1191 (1992).

 Moreover, a statement, "even if expressed in terms of an opinion, can be defamatory under certain circumstances regardless of whether the statement concerns a public figure or private person." *Agora,* 90 F.Supp.2d at 701 (quoting *Peroutka,* 116 Md.App. at 321, 695 A.2d 1287). The determi-

nation whether a statement is defamatory is one of law and is to be made by the court. *Chesapeake Publishing v. Williams,* 339 Md. 285, 295, 661 A.2d 1169 (1995). Piscatelli also asserts a claim for invasion of privacy/false light. However, such a claim "may not stand unless the claim also meets the standards of defamation." *Crowley v. Fox Broadcasting Co.,* 851 F.Supp. 700, 704 (D.Md.1994) (applying Maryland law).

There are three defenses that, if applicable, bar recovery. The first is the qualified privilege to report upon judicial proceedings. *Chesapeake Publishing,* 339 Md. at 296, 661 A.2d 1169 ("In Maryland, there exists a qualified privilege to report on legal proceedings, even if the story contains defamatory material, as long as the account is fair and substantially accurate.") This privilege is qualified and can be overcome upon a showing of actual malice. *Id.* There are two not necessarily inconsistent approaches to the meaning of "malice" in this context. The first is drawn from the Supreme Court's landmark opinion in *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Under this analysis, the privilege is not applicable if the reporter knew that the republished statements were false or acted with reckless disregard as to their truth or falsity. *Rosenberg v. Helinski,* 328 Md. 664, 677–78, 616 A.2d 866 (1992); *Marchesi v. Franchino,* 283 Md. 131, 134–35, 387 A.2d 1129 (1978). The second approach, based upon the Restatement (Second) of Torts § 611, Comment a (1977), focuses upon the fairness and accuracy of the report. Under this approach, the privilege is applicable as long as the report is " 'accurate and complete or a fair abridgement of the occurrence reported.' " *Rosenberg,* 328 Md. at 678, 616 A.2d 866 (quoting Restatement (Second) of Torts § 611). Maryland favors the latter approach. *See, e.g., Chesapeake Publishing,* 339 Md. at 296–97, 302 n. 5, 661 A.2d 1169; *Rosenberg,* 328 Md. at 678, 616 A.2d 866.

The second defense is the fair comment privilege:
It is recognized that a newspaper like any member of the community may, without liability, honestly express a fair and reasonable opinion or comment on matters of legitimate

public interest. The reason given is that such discussion is in the furtherance of an interest of social importance, and therefore it is held entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation.

\* \* \*

 The distinction between "fact" and "opinion," although theoretically and logically hard to draw, is usually reasonably determinable as a practical matter: Would an ordinary person, reading the matter complained of, be likely to understand it as an expression of the writer's opinion or as a declaration of an existing fact? An opinion may be so stated as to raise directly the inference of a factual basis, and the defense of fair comment usually has been held not to cover an opinion so stated.

*A.S. Abell Co. v. Kirby*, 227 Md. 267, 272, 274, 176 A.2d 340 (1961) (citations omitted).

 The third defense at least arguably in play in the case is that a person is entitled to express an opinion without liability if "the facts from which a defendant forms his or her opinion are given or are readily available and those facts cannot be proved false...." *Peroutka*, 116 Md.App. at 320, 695 A.2d 1287. Elaborating on this principle, Judge Cathell identified four possible variations:

"(1) If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of false and defamatory facts, he is subject to liability for the factual statement but not for the expression of opinion.

(2) If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of facts that are not defamatory, he is not subject to liability for the factual statement—nor for the expression of opinion, so long as it does not reasonably indicate an assertion of the existence of other, defamatory, facts that would justify the forming of the opinion. The same result is reached if the statement of facts is defamatory but the facts are true ... or if the defendant is not shown to be guilty of the requisite fault

regarding the truth or defamatory character of the statement of facts. . . .

(3) If the defendant bases his expression of a derogatory opinion on the existence of 'facts' that he does not state but that are assumed to be true by both parties to the communication, and if the communication does not give rise to the reasonable inference that it is also based on other facts that are defamatory, he is not subject to liability, whether the assumed facts are defamatory or not.

(4) If the defendant expresses a derogatory opinion without disclosing the facts on which it is based, he is subject to liability if the comment creates the reasonable inference that the opinion is justified by the existence of unexpressed defamatory facts."

*Id.* (quoting Restatement (Second) of Torts § 566 Comment c (1976)).

### (2)

During discovery, Piscatelli was asked to identify the specific portions in each of the articles that was defamatory. He did so and we will discuss each passage later in this opinion.

With this as background, Piscatelli asserts:

Had the City Paper merely reported in the December 6, 2006 article that the court file indicated that Piscatelli was implicated by an unknown person as reported by Pam Morgan and Van Smith[,] then . . . the fair reporting privilege survives. Had the City Paper in the June 20, 2007 article reported on the testimony of Piscatelli and the argument of defense counsel in attempting to create reasonable doubt that Piscatelli had a motive to kill Jason Convertino and fairly and accurately reported that other promoters were implicated as potentially having a motive to kill Jason Convertino and fully reported that the jury did not accept these arguments and found Anthony Jerome Miller guilty of the murders, than [sic] the fair reporting privilege would've applied. Contrary to fully, fairly and accurately reporting on the criminal trial, the City Paper has first injected itself

into the controversy by Van Smith disclosing that someone told him that the other person heard Piscatelli threatened to kill Jason Convertino. Moreover, in the June 20, 2007 article the City Paper headline and the entire tenor of the article is that the police and the State's Attorney were incorrect in assuming that ... Miller acted alone and that based upon the unsubstantiated hearsay from an unknown source contained in discovery material that was never introduced at trial that Piscatelli had hired someone to kill Jason Convertino. By placing its own theory on the case that someone other than [Miller] was involved in the murder is defamatory and at least raises a factual question to be determined by a jury and not on summary judgment....

Piscatelli's contention has merit only if one or more of the relevant passages in the newspaper articles were defamatory. If this condition is satisfied, he can recover only if appellees are not protected by one or more of the defenses described above. In reviewing the circuit court's grant of the motion for summary judgment, we interpret the facts in a light most favorable to Piscatelli. Nonetheless, he is still required to "identify with particularity each material fact as to which it is contended that there is a material dispute." Maryland Rule 2–501(b). We now turn to the specific passages in the articles that Piscatelli asserts were defamatory.

We start our analysis by noting that the murders of Convertino and Wisniewski and Miller's trial for those murders are matters of public interest and concern. Additionally, we point out that Piscatelli, in his deposition, admitted that the complained-of statements do not contain falsities. That is to say, while he challenges the underlying truths of the statements, he does not dispute that the statements are accurate representations of what occurred at trial and what individuals told Smith.

Our review of the statements in the articles identified by Piscatelli as defamatory leads us to conclude that they are all covered by either the fair reporting or fair comment privileges

or are opinions and, thus, are not bases for liability. We will now address each allegedly defamatory passage separately.

1. "But, despite Miller's conviction, the Redwood Trust double murders remain mysterious."

■ This statement contains an assertion of fact, namely that Miller was convicted, which is unquestionably true. It also contains an expression of opinion, i.e., that the murders remain mysterious. The expression of that opinion is privileged because it "honestly express[es] a fair and reasonable opinion or comment on matters of legitimate public interest." *Kirby*, 227 Md. at 270, 176 A.2d 340.

2. "Morgan recalls that, right after the murders in 2003, she was led to believe by the initial homicide investigators that the killings were done by more than one person. 'From day one, they all seemed to give me the inkling that the crime scene led to at least two people being in the apartment,' she says. 'I never was told any facts about how they got that. I don't know. But that's all they've all led me to believe—that, and that there was no evidence, and that they didn't think the case would ever be solved. Up until, of course, Detective Ritz took over.'

The idea that more than one person was involved in her son's death has stuck with Morgan. Even though Miller is now serving time, she says, 'I don't know if [the truth] will come out' about the full circumstances surrounding the crime. 'I hope it does, because this is the hardest thing—to live without knowing if Miller was alone, or if someone else really was the cause of Miller doing this. I really want to know the whole truth, no matter who it comes from or whatever they discover. Once I know the whole truth, I think then I'll be OK for whatever life I have left.'"

■ The excerpt reflects the opinions of Morgan because "an ordinary person, reading the matter complained of, [would] be likely to understand it as an expression of [opinion]" and the factual basis for those opinions are readily ascertainable from the same quotation. *Kirby*, 227 Md. at 272, 274, 176 A.2d 340. The comment falls into the second of the

four categories described by this Court in *Peroutka*, 116 Md.App. at 320, 695 A.2d 1287. It is, thus, covered by the fair comment privilege. *Kirby*, 227 Md. at 272, 176 A.2d 340.

3. "Sam Miller *[Anthony Miller's brother]* stood up and left the courtroom with the baby. After the hearing, he walked down Saratoga Street outside the courthouse, still carrying Miller's son, and declared to a reporter that 'it's not over.'

Sam Miller was reiterating a point he made at length during a phone conversation days earlier. 'I hope the investigators won't be satisfied with this,' he said of his brother's conviction. 'These murders were a conspiracy,' he continues, 'Anthony might have known something about it, but sometimes people feel they have to keep their mouth shut.' "

 The above-quoted text is clearly an expression of an opinion about the evidence adduced at Miller's trial. It is covered by the fair comment privilege. *Kirby*, 227 Md. at 272, 274, 176 A.2d 340.

4. "Take, for instance, the motive that Convertino's boss may have had. Convertino was hired to manage Redwood Trust by Nicholas Piscatelli, a successful Baltimore real-estate developer. Piscatelli meticulously restored a historic downtown bank building that had survived the Great Baltimore Fire of 1904 to house his posh nightclub. Convertino, witnesses testified at Miller's trial, was planning to take his proven skills as a scene-maker to one of Redwood Trust's competitors, Bohager's Bar and Grill, when the murders happened. More specifically, Convertino was scheming to take a P. Diddy event that was scheduled to happen at Redwood Trust on April 13, 2003, to Bohager's instead; after the murders, on April 11, P. Diddy appeared at Redwood Trust, as originally planned. What's more, Piscatelli suspected Convertino of stealing not just shows, but money from Redwood Trust."

 Piscatelli does not dispute the accuracy of the statements of fact. His issue with this excerpt is its suggestion

that he had a motive to murder Convertino. Smith's comment that Piscatelli may have had a motive is fair in light of the information directly following it: that Convertino was planning to take business away from appellant's nightclub and that appellant suspected Convertino of stealing from him. The above-quoted text is covered by the fair comment privilege. *Kirby*, 227 Md. at 272, 274, 176 A.2d 340.

> 5. "Polansky *[Miller's trial attorney]* had made his point: Convertino's skills as a nightlife manager and promoter were valuable to Redwood Trust. If Convertino went to work for a rival—Bohager's, as he was about to do— Redwood Trust would be competing against him in the nightlife market. It might not seem like a suitable motive for murder, but neither does the theft of a credit card and a laptop. (Piscatelli has not been charged with any crime in relation to Convertino and Wisniewski's deaths.)"

The first portion of the quoted text is a fair and accurate report of Miller's defense attorney's examination of Piscatelli. It is covered by the fair reporting privilege. *Chesapeake Publishing*, 339 Md. at 296, 661 A.2d 1169. The sentence: "It might not seem like a suitable motive for murder, but neither does the theft of a credit card and a laptop" is a fair comment relating to the testimony elicited from appellant by Miller's attorney. It is covered by the fair comment privilege. *Kirby*, 227 Md. at 272, 274, 176 A.2d 340.

> 6. "For a long time, Pam Morgan suspected that Nick Piscatelli had something to do with her son's death. Her radar went up early on, when she met with detective Blane Vucci—the first lead investigator on the case—on her first visit to Baltimore, right after the murders in 2003. Morgan had thought of Piscatelli as nothing more than her son's employer prior to the murders. But she recalls that when she told Vucci that she thought that the murders must have something to do with Redwood Trust, 'because if Jay new anybody, it would have been through the business,' Vucci's heated reaction surprised her."

 The above-quoted passage is Morgan's description of how she came to suspect appellant was involved in her son's murder, a matter of public concern. An ordinary person reading such statements would clearly recognize that they are expressions of opinion by Morgan, not statements of fact, falling into the second of the four categories described by this Court in *Peroutka*, 116 Md.App. at 320, 695 A.2d 1287. They are protected by the fair comment privilege. *Kirby*, 227 Md. at 272, 274, 176 A.2d 340.

> 7. "One of the things she shared with the police had to do with Piscatelli. About a month after the killings, in May 2003, a benefit was held near Binghamton to raise money for Convertino's young daughter. About 500 people showed up, and while it was going on, Morgan says she was approached by a man she'd never seen before and hasn't seen since. 'He said that Nick Piscatelli was behind my son's murder,' Morgan recalls, 'that [Piscatelli had] hired someone to do it, and that he'd covered his tracks.'
>
> Since then, Morgan had kept Piscatelli close. She says she maintained a phone relationship with him, never letting on that she suspected his involvement."

 The first portion of this passage is an accurate summary of Morgan's statement to the prosecution in Miller's case as disclosed in the October 27, 2006, supplemental discovery disclosure statement. This portion of the statement is protected by the fair reporting privilege. *Chesapeake Publishing*, 339 Md. at 296, 661 A.2d 1169. The second portion is Morgan's description of how she came to suspect Piscatelli was involved in her son's murder, a matter of public concern. An ordinary person reading such statements would clearly recognize that they are expressions of opinion by Morgan, not statements of fact. Morgan's opinions fall into second of the four categories described by this Court in *Peroutka*, 116 Md.App. at 320, 695 A.2d 1287. In addition, they are protected by the fair comment privilege. *Kirby*, 227 Md. at 272, 274, 176 A.2d 340.

8. "Don't forget, she continues, '[the police] told me they felt two people were involved. And of course, I'm thinking, Well somebody came [to the benefit] and told me that. Was he the second person? Now, I don't know.'"

■■■ This excerpt describes Morgan's description of how she came to suspect Piscatelli was involved in her son's murder, a matter of public concern. An ordinary person reading such statements would clearly recognize that they are expressions of opinion by Morgan, not statements of fact. They are protected by the fair comment privilege. *Kirby*, 227 Md. at 272, 274, 176 A.2d 340.

9. "But Piscatelli is concerned about recent indications that the case is delving into the possibility that he had something to do with the crime."

■■■ This statement is covered by the fair reporting privilege as it is a fair and accurate statement on a judicial proceeding. *Chesapeake Publishing*, 339 Md. at 296, 661 A.2d 1169.

10. "On Oct. 27, *[Assistant State's Attorney]* Holback disclosed in a memorandum to the defense that 'Pam Morgan [Convertino's mother] has stated that an unknown man approached her at a benefit in Binghamton, New York, held for her son's child shortly after his murder. The man advised her that Nick Piscatelli was behind her son's murder, he covered his tracks and hired someone to kill him.' The memo does not indicate when Morgan shared this information with investigators, but she told City Paper during a Nov. 30 phone interview that the event was held in May 2003, just weeks after the murders.

'At the benefit, this guy comes up to me and he says he knows who was behind my son's murder' Morgan recalls. 'I didn't know Nick [Piscatelli] at that point.'"

The above quoted text is a fair and substantially accurate report on the discovery memorandum filed in the Miller case. As such, it is covered by the fair reporting privilege. *Chesapeake Publishing*, 339 Md. at 296, 661 A.2d 1169.

11. "'He came in, talked, and left,' [*Morgan* ] continues. 'I was like, "Whoa!" And that's when I first started questioning the club, and had these theories [that Piscatelli might be involved]. And I also thought, did [the unknown man] do it purposefully, to throw it off someone else by naming Nick? Because there is no evidence against Nick.'

Still, she says she's fearful of Piscatelli, and now that her suspicions have been made public in Miller's case [3] file she says she will stop calling him. 'That was my last call to him, probably in September,' Morgan recalls, when she says she discussed with Piscatelli items still in his possession that belonged to her son. (The memo also discloses that Morgan told investigators that this reporter shared with her information about Piscatelli obtained through unnamed sources)."

▮▮▮ These statements related to the information obtained by Morgan, which was the subject of the State's supplemental discovery memorandum in the Miller case. An ordinary person reading such statements would clearly recognize that they are expressions of opinion by Morgan, not statements of fact. They are protected by the fair comment privilege. *Kirby*, 227 Md. at 272, 274, 176 A.2d 340.

Although the circuit court did not expressly articulate the grounds for its decision, our review of the record leads us to conclude it did not err in granting summary judgment.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

**3.** Specifically, the document entitled "State's Supplementary Disclosure," filed in the Miller case, stated that:

1. Pam Morgan has stated that an unknown man approached her at a benefit in Binghamton, N.Y. held for her son's child shortly after his murder. The man advised that Nicholas Piscatelli was behind her son's murder, he covered his tracks and hired someone to kill him.

2. Ms. Morgan advised that Van Smith, a reporter for City Paper, told her someone told him that he had heard Nick threaten to kill Jason.