Irwin Industrial Tool Company v. Christine Pifer, et al., No. 49, September Term, 2021

**AUTHENTICATION THROUGH CIRCUMSTANTIAL EVIDENCE UNDER MARYLAND RULE 5-901(b)(4) – "REASONABLE JUROR" TEST – ALTERNATIVE GROUNDS FOR SUMMARY JUDGMENT –** Court of Appeals held that items purchased on eBay that purportedly contained defendant's product contaminated with asbestos were authenticated as exemplars of product, as there was sufficient circumstantial evidence for reasonable juror to find by preponderance of evidence that substance within containers was defendant's product. Court of Appeals concluded that in granting motion *in limine* on ground that plaintiffs could not establish chain of custody with respect to samples, trial court required greater degree of proof of authentication than Maryland Rule 5-901 and relevant case law entails.

Court of Appeals held that record did not demonstrate that circuit court granted summary judgment on grounds other than plaintiffs' concession that summary judgment was warranted due to grant of motion *in limine* and exclusion of sample evidence. Court of Appeals declined to address alternative grounds for affirming trial court's grant of summary judgment, as trial court did not explicitly rely on other grounds.

IN THE COURT OF APPEALS

OF MARYLAND

No. 49

September Term, 2021

_____

IRWIN INDUSTRIAL TOOL COMPANY

v.

CHRISTINE PIFER, ET AL.

_____

*Getty, C.J.
Watts
Hotten
Booth
Harrell, Glenn T., Jr. (Senior
Judge, Specially Assigned)
Raker, Irma S. (Senior Judge,
Specially Assigned)
McDonald, Robert N. (Senior
Judge, Specially Assigned),

JJ.

_____

Opinion by Watts, J.

_____

Filed: May 31, 2022

*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In a civil action, when it is difficult or impossible to obtain the exact product that allegedly caused an injury or disease, a plaintiff may seek to introduce into evidence an allegedly comparable version of the product as an exemplar—that is, "[a] typical example" or "a standard specimen[.]" *Exemplar*, Black's Law Dictionary (11th ed. 2019). In this case, the plaintiffs sought to authenticate under Maryland Rule 5-901 items purchased on eBay as exemplars of a product, made by the defendant, that was used from the late 1960s through the 1980s and that allegedly contained asbestos. We must address the defendant's request that we affirm the trial court's grant of a motion *in limine* and summary judgment on the grounds that the plaintiffs were unable to sufficiently authenticate exemplars of the product at issue and were therefore unable to establish their claims. We must also address the defendant's contention that the trial court considered and granted summary judgment on alternative grounds, and, if we conclude that the trial court did so, address whether the trial court's determination should be affirmed.

From the 1960s through the 1980s, while working for a carpet installation company, in the performance of his job, Richard Pifer used Strait-Line marking chalk, which was manufactured and sold by Irwin Industrial Tool Company ("Irwin"), Petitioner. In 2016, Mr. Pifer died of mesothelioma, the primary cause of which is exposure to asbestos. In the Circuit Court for Baltimore City, Christine Pifer, his surviving spouse and the executor of his estate, and Wanda Mounts, his child (together, "the Estate"),[1] instituted a wrongful death and product liability action against Irwin. The Estate alleged that Irwin sold Strait-

---

[1]For consistency, like the Court of Special Appeals, we refer to the plaintiffs as "the Estate."

Line marking chalk from 1960 to 1982 that contained asbestos and caused Mr. Pifer's death from mesothelioma.

The Estate purchased on eBay several Strait-Line marking chalk containers and the powder within them, which it contended were products originally sold by Irwin as Strait-Line marking chalk and that, according to its expert, tested positive for the presence of asbestos. In addition, the Estate located in Mr. Pifer's garage a bottle of Strait-Line chalk that its expert also determined tested positive for asbestos. Irwin filed a pretrial motion *in limine* to exclude any testimony or evidence regarding the analysis of Strait-Line chalk by the Estate's expert that had resulted in a finding of asbestos in the chalk. Irwin contended that the eBay purchases, *i.e.*, the powder in the containers, could not be authenticated as the product that it manufactured and sold as Strait-Line marking chalk.

Irwin moved for summary judgment on multiple grounds, including that, if the circuit court granted the motion *in limine*, there would be no factual predicate for the Estate's claim that Mr. Pifer had been exposed to asbestos from Strait-Line marking chalk. In addition, Irwin moved for summary judgment on the ground that the Estate could not demonstrate that it owed a duty to Mr. Pifer and on the basis that it was entitled to summary judgment on the strict liability and breach of warranty claims.

The circuit court conducted a motions hearing and granted Irwin's motion *in limine* as to the containers purchased on eBay, but not as to the bottle that had been found in Mr. Pifer's garage. At the conclusion of the hearing, the circuit court took under advisement the grounds raised by Irwin for summary judgment. The next morning, the circuit court and counsel for both parties participated in a teleconference, during which the Estate's

counsel conceded that summary judgment was warranted, reasoning that without evidence of the containers purchased on eBay the Estate could not establish a *prima facie* case, *i.e.*, there was insufficient admissible evidence on which to establish that Mr. Pifer had been frequently and regularly exposed to asbestos through contact with Irwin's product.[2]

Thereafter, the circuit court issued an order granting Irwin's motion *in limine* and an order granting, without explanation, the motion for summary judgment and dismissing all of the Estate's claims. The Estate appealed, and the Court of Special Appeals reversed and remanded the case to the circuit court, concluding that the containers purchased on eBay were sufficiently authenticated and that the grant of summary judgment based on the determination that there was not admissible evidence on which to challenge Irwin's request for summary judgment was erroneous. See Pifer v. Irwin Indus. Tool Co., 252 Md. App. 57, 60, 258 A.3d 879, 881 (2021). The Court of Special Appeals declined Irwin's request to affirm the grant of summary judgment on alternative grounds, concluding that the record demonstrated that the circuit court granted summary judgment because the Estate conceded that it needed the eBay samples to defeat the motion, but not on the other grounds advanced by Irwin which the circuit court had taken under advisement. See id. at 60, 258 A.3d at 881. Irwin filed a petition for a writ of *certiorari*, which we granted. See Irwin Indus. Tool Co. v. Pifer, 476 Md. 584, 264 A.3d 1283 (2021).

Below, in Part I, we hold that the containers purchased on eBay were authenticated

---

[2]The Estate was required to meet the "frequency, proximity and regularity" standard applicable in asbestos cases regarding Mr. Pifer's exposure to Irwin's chalk product, which allegedly contained asbestos. See Eagle-Picher Indus. v. Balbos, 326 Md. 179, 210, 604 A.2d 445, 460 (1992).

under Maryland Rule 5-901(a) because there was sufficient circumstantial evidence for a reasonable juror to find by a preponderance of the evidence that the powder within the containers was Strait-Line marking chalk. As such, we affirm the judgment of the Court of Special Appeals, which reversed the trial court's grant of the motion *in limine* and summary judgment. In Part II, we decline to address alternate grounds for affirming the grant of summary judgment, *i.e.*, grounds other than the Estate's concession that it could not establish its case without the excluded evidence, because it is not clear that in granting summary judgment the circuit court reached a conclusion with respect to any alternative ground.

## BACKGROUND

### Strait-Line Marking Chalk

Given that there is no material dispute between the parties concerning Mr. Pifer's employment as a carpet installer, his use of Strait-Line marking chalk as part of his job, and the Estate's purchase and testing of the contents of containers purportedly containing such chalk—although the parties certainly dispute whether the powder within the containers was sufficiently authenticated as Strait-Line marking chalk—we set forth the facts as described by the Court of Special Appeals. The Court of Special Appeals summarized the circumstances surrounding Mr. Pifer's use of Strait-Line marking chalk, the testing of the contents of containers that purportedly contained such chalk, and the parties' allegations concerning whether the chalk contained asbestos as follows:

> Irwin Auger Bit Company was founded in 1885 and claimed to be "the largest producer of wood-boring tools." In 1960, Irwin bought Strait-Line Products Company. After merging, Irwin redesigned all of the Strait-

Line products and developed new packaging for them. All of Irwin's Strait-Line products were made and packaged in Wilmington, Ohio. Among the products was a chalk, Strait-Line Marking Chalk, that was used, as its name suggests, for marking.

Mr. Pifer was an employee of Clyde W. Dent Carpet Installation ("Dent") in College Park, Maryland from 1960 to 2002. Initially, Mr. Pifer worked as a mechanic, installing carpet, from 1960 until the mid-1970s. He transitioned to working in the Dent warehouse, where he cut carpet to size.

As a mechanic, Mr. Pifer used Strait-Line marking chalk every day to mark on carpet where it needed to be cut or placed. Mr. Pifer also refilled his marking chalk squeeze bottle when it became empty. The marking chalk created a lot of dust, which Mr. Pifer encountered on average fifty times per day.

Strait-Line marking chalk was the only brand of chalk that Dent stocked in its warehouse from 1960 to the 1980s. . . . In the 1980s, Dent started using a cutting machine, which greatly reduced Mr. Pifer's chalk exposure. In 1989 or 1990, Mr. Pifer transitioned to working in the office, and his exposure to Strait-Line marking chalk ended.

Doctors diagnosed Mr. Pifer with malignant mesothelioma on October 27, 2016. He died from the disease two months later, on December 30, 2016. The primary cause of mesothelioma is exposure to asbestos. 1A Arthur L. Frank, *Sourcebook on Asbestos Diseases Medical Aspects* 65 (2004).

* * *

The investigation into Irwin's Strait-Line chalk began after Mr. Pifer's death. The Estate noticed a bottle of Strait-Line chalk in Mr. Pifer's garage among the tools he used when working for Dent. The Estate gave the chalk bottle and the tools to counsel, who sent it to a laboratory for analysis. The chalk bottle was the only item that had positive results for asbestos.

The parties do not dispute, as the Estate explains in its brief, that to test the proposition that Strait-Line Chalk—beyond the one bottle located in Mr. Pifer's garage—was contaminated with asbestos the Estate's counsel acquired vintage samples of Strait-Line chalk from around the country, primarily through eBay.

Dr. William Longo, the Estate's expert, analyzed all of the samples at

Materials Analytical Services, LLC ("MAS"). Dr. Longo analyzed the samples using three well-recognized methods: polarized light microscopy, analytical transmission electron microscopy, and automated field emission scanning electron microscopy. Thirty-six samples were tested in total:

• Twenty samples were labeled as Irwin Auger Bit Co. Of these, three were not sealed when received for testing. One of the three, however, was the sample from Mr. Pifer's garage.

• One sample was labeled as American Tool Co. This sample was open when it was received for testing.

• One sample was labeled as Irwin Tools. This sample was open when it was received for testing.

• Fourteen samples were labeled as The Irwin Co., none of which was sealed when received for testing.

Of the thirty-six samples, the expert found the following:

• Nineteen samples (53%) tested positive for regulated amphibole asbestos. Of the nineteen that tested positive, three samples were opened when received for testing, one of which was the bottle found in Mr. Pifer's garage.

• The primary source of the regulated asbestos in the nineteen positive samples was from either dolomite/calcium carbonate or talc used in these marking chalk products.

• The analysis and results of the nineteen sealed Irwin containers removes the possibility that the samples were tampered with or contaminated prior to their arrival at MAS.

• Eighteen of twenty (90%) of the samples manufactured by The Irwin Auger Bit Company from 1960 to 1982 tested positive for asbestos.

• Fourteen of fourteen (100%) of the samples manufactured by The Irwin Company from 1982 to 1993 tested negative for regulated asbestos.

The samples tested positive for noncommercial amphibole asbestos, more specifically "[a]ll of the amphibole fibers and bundles found using

either [method of analysis] were either regulated tremolite/actinolite or anthophyllite asbestos." "Asbestos fibers belong to one of two mineral groups: amphibole or serpentine." Frank, *supra*, at 4-5. Both anthophyllite and tremolite are amphiboles. *Id.* "Anthophyllite, a natural contaminant of talc and other forms of asbestos, no longer occurs in quantities sufficient for commercial use." *Id.* Tremolite is also a natural "contaminant of talc" and "does not occur in any commercially useful quantities." *Id.* at 5-6.

The Estate asserts that asbestos is a naturally occurring contaminant of calcium carbonate. Calcium carbonate is a mineral mined from the earth, like talc, and was used to manufacture chalk products, including Irwin Strait-Line. The Estate claims that "[c]ontamination occurs [] when calcium carbonate cohabits the same geological mining location as asbestos." In his affidavit, Dr. Longo states, as an example, that "calcium carbonate/limestone as well as talc and asbestos are often located in the same geological areas in Georgia."

Irwin contends that the Irwin marking chalks alleged to have been used by Mr. Pifer were formulated to contain only calcium carbonate. Further, Irwin argues that the Estate has "not identified any published scientific literature or government guidance ... that establishes or even postulates that calcium carbonate can be contaminated with asbestos fibers."

Pifer, 252 Md. App. at 60-63, 258 A.3d at 881-82 (alterations and last ellipsis in original).

For use at trial, the Estate sought to authenticate as exemplars of Strait-Line marking chalk nineteen containers that were purchased on eBay and the container from Mr. Pifer's garage, which contained powder that tested positive for asbestos. The container from Mr. Pifer's garage was described by the parties as a "ketchup bottle"—that is, an eight-ounce squeeze bottle with a nozzle on top, much like a bottle of ketchup that one would see at a restaurant. Four of the containers bought on eBay that the Estate sought to authenticate were half-pound cans with pour spouts, much like a can of salt. Eleven of the containers purchased on eBay were one-ounce cardboard box containers and four were one-ounce containers with metal bottoms and plastic pour spouts. The Estate demonstrated that the

containers purchased on eBay had chalk in them that corresponded with the color designated on their label. The Estate established that the samples purchased on eBay that tested positive for asbestos were purchased from sellers located in various different cities across various different states.

Nineteen samples that were tested by the Estate's expert, Dr. Longo, tested positive for regulated amphibole asbestos. Seventeen of the nineteen containers were sealed when received by the Estate's counsel. Of twenty samples that bore the name Irwin Augur Bit Company, which had been Irwin's name from 1960 to 1982, eighteen tested positive for asbestos. Of the eighteen Irwin Augur Bit Company containers that tested positive, according to Dr. Longo, sixteen were sealed. The containers purchased on eBay that bore the name Irwin Augur Bit Company that contained powder that tested positive for asbestos were obtained from sellers in the following nine different cities: Farmersville, Ohio; Enfield, Connecticut; Winchester, Kentucky; Wyandotte, Michigan; St. Cloud, Minnesota; Granville, Illinois; and Alexandria, Lexington, and New Castle, Indiana.

**Motions and Rulings of the Circuit Court**

Prior to trial, Irwin filed a motion *in limine* accompanied by a memorandum seeking to exclude the materials that Dr. Longo tested and all testimony and exhibits referencing the testing. Irwin contended that the Estate could not authenticate the powder in the containers as Strait-Line marking chalk of the type to which Mr. Pifer had been exposed. Irwin asserted that in a products liability case, for evidence to be admissible, a plaintiff must show that the evidence was "in the same condition at the time it left the defendant's possession" and that a reliable chain of custody is necessary where a substance is

- 8 -

"susceptible to 'tampering or commingling.'" In making this argument, Irwin relied on criminal cases in which, in having evidence admitted at trial, the State was required to establish a chain of custody: Amos v. State, 42 Md. App. 365, 400 A.2d 468 (1979), Best v. State, 79 Md. App. 241, 556 A.2d 701, cert. denied, 317 Md. 70, 562 A.2d 718 (1989), and Jones v. State, 172 Md. App. 444, 915 A.2d 1010, cert. denied, 399 Md. 33, 922 A.2d 574 (2007).

In addition, Irwin argued that the circuit court had previously, in other cases, excluded exemplar evidence under similar circumstances. Irwin asserted that in other cases the circuit court had excluded such evidence because of gaps in the chain of custody from the time of manufacture and sale or distribution of a purported sample to the time of collection by the plaintiff. Irwin maintained that without establishing a chain of custody, the Estate could not prove that the containers purchased on eBay contained Strait-Line marking chalk in its original condition.

Irwin contended that the Estate could not eliminate to any degree of certainty the possibility that the contents of the containers purchased on eBay had been adulterated or replaced with a material that it did not manufacture. Irwin argued that with the containers being decades old and there being no information concerning their whereabouts before the purchases on eBay, the containers could have been opened and the contents could have been tainted or replaced with a material that it did not manufacture. Irwin asserted that Strait-Line marking chalk is especially vulnerable to commingling with other substances because its containers are manufactured so that they may be refilled, and that as such, the Estate could not demonstrate that the powder within the containers was powder from the

time period in which the container was manufactured.

Irwin filed a motion for summary judgment in which it sought judgment on multiple grounds. Irwin argued that if the circuit court granted the motion *in limine*, it would be entitled to summary judgment because there would be no factual predicate for the claim that its product contained asbestos and therefore the circuit court would be required to grant summary judgment as to all of the Estate's claims. Specifically, Irwin maintained that if the motion *in limine* were granted, the Estate could not demonstrate that Mr. Pifer's exposure to asbestos was frequent, regular, and proximate, as required under Eagle-Picher Indus., Inc. v. Balbos, 326 Md. 179, 210, 604 A.2d 445, 460 (1992).

In addition, Irwin contended that it was entitled to summary judgment on the Estate's negligence claim because the Estate could not establish that Irwin had a duty to warn Mr. Pifer of the alleged dangers of its products and could not show that it knew or should have known that its products were contaminated with asbestos. Irwin argued that it was entitled to summary judgment on the claim for strict liability because, among other things, Virginia law does not recognize strict liability as a cause of action in product liability cases, and that it was entitled to summary judgment on the breach of warranty claim because under Virginia law, the Estate could not prove that Strait-Line marking chalk was unreasonably dangerous and the claim was time barred under Maryland law.[3] Irwin

---

[3]In the motion for summary judgment, Irwin contended that because Mr. Pifer was diagnosed with mesothelioma in Virginia, Virginia was the place of the injury and that "under Maryland's 'place of the injury' choice of law analysis," Virginia law applied to the action but that Maryland's standard for summary judgment was unaffected by the application of Virginia case law on substantive issues.

also argued that it was entitled to summary judgment on the loss of consortium and wrongful death claims.[4]

On October 15, 2019, the circuit court held a hearing on the motions. At the hearing, Irwin's counsel contended that the motion *in limine* was dispositive and that the Estate had acknowledged that, if the circuit court granted the motion, it should also grant the motion for summary judgment. The Estate's counsel agreed that the motion *in limine* was dispositive and that, if the circuit court granted it, the Estate's case would be over.

After hearing argument on the motion *in limine*, the circuit court determined that the Estate had failed "to make the requisite showing under [Maryland Rule] 5-901" with respect to the containers purchased on eBay. In other words, the circuit court determined that the Estate had failed to meet its burden to authenticate the contents of the containers. The circuit court reasoned that the containers were not authenticated because the Estate failed to provide a chain of custody as to the containers by not accounting for the circumstance that at a minimum there was "a 36-year gap between when the samples were manufactured and when they were purchased on eBay." The circuit court found that the Estate had not proven that the containers were in substantially the same condition as they were when they left Irwin's control or demonstrated that the chalk in the containers was the same kind that Mr. Pifer used in the warehouse.

The circuit court relied on criminal case law for the proposition that in a products liability case a plaintiff must demonstrate a reliable chain of custody for authentication of

---

[4]The Estate filed an opposition to the motion *in limine* and the motion for summary judgment. Irwin filed replies in support of the motions and the Estate filed surreplies.

evidence where the evidence is susceptible to tampering or alteration. In support of this theory, the circuit court cited <u>Best</u>, 79 Md. App. 241, 556 A.2d 701. In addition, citing <u>Jones</u>, 172 Md. App. 444, 915 A.2d 1010, the circuit court stated that the burden falls on the proponent of the evidence to negate the possibility of tampering, thereby precluding the likelihood that the condition of the evidence has changed.

Applying these principles to the case, the circuit court concluded that the Estate had failed to establish a chain of custody for the decades-long period from when Irwin manufactured the containers to when they were purchased on eBay. The circuit court stated that the Estate's counsel did not know where the containers had been before buying them on eBay and that there was no information about the eBay sellers or other previous owners of the containers. The circuit court stated that there was no evidence that the containers were sealed by Irwin and not by other unknown parties in the "chain of commerce" before their sale on eBay. The circuit court reasoned that the evidence merely supported the possibility, not the probability, that the containers were what they appeared to be.

At the motions hearing, the circuit court also heard arguments on the motion for summary judgment. Irwin's counsel began by stating that, in light of the circuit court's ruling as to authentication, he could substantially curtail the argument in support of summary judgment. Nevertheless, Irwin's counsel argued that with the Estate's evidence having been limited to potentially the one sample found in Mr. Pifer's garage, that even if that sample could be properly authenticated, the Estate was unable to establish Mr. Pifer's regular and frequent exposure to asbestos through alleged contact with its product.

In addition, Irwin's counsel argued other grounds for the grant of summary

judgment. Irwin's counsel contended that the negligence and strict liability duty to warn claims require that the defendant owe a duty to the plaintiff and that the existence of a duty is a "legal question" for the court, not a jury. Irwin's counsel asserted, among other things, that Maryland law holds that "a manufacturer has a duty to warn only if the manufacturer knew or should have known that its products were dangerous[,]" that the Estate had failed to offer evidence showing that Irwin knew or should have known that asbestos could contaminate calcium carbonate, and that no such evidence could be produced. Irwin's counsel also argued that the Estate could not prove its strict liability manufacturing defect claim because it could not satisfy factors set forth in Phipps v. General Motors Corp., 278 Md. 337 (1976).

After hearing argument on the motion for summary judgment, the circuit court denied the motion "in pertinent part" stating that the ruling was due to the likely admissibility of the container from the Mr. Pifer's garage. The circuit court concluded that because of the likely admissibility of the container from Mr. Pifer's garage there was a genuine dispute of material fact and that the issue of whether there was an inference that Mr. Pifer had been exposed to asbestos with the proximity, frequency, and regularity required under Balbos, 326 Md. at 210, 604 A.2d at 460, had not been "addressed directly or targeted directly in the motion for summary judgment[.]"

Irwin's counsel asked whether the circuit court would rule on the legal issues it raised as to the negligence and strict liability claims. Specifically, Irwin's counsel asked whether the circuit court would address the duty issue for the negligence claim and the Phipps standard for the strict liability claim. The circuit court responded that it would take

the issues under advisement but reiterated that the motion for summary judgment was denied due to the likely admissibility of the container from Mr. Pifer's garage. The circuit court advised that it would not be able to address the remaining issues before October 22, 2019.

On brief in this Court, the Estate advised that on the morning of October 16, 2019, the day after the motions hearing, during a teleconference with the circuit court and counsel for both parties, the Estate's counsel conceded that summary judgment was warranted because, without the containers bought on eBay, the Estate could not establish a *prima facie* case. At oral argument, the Estate's counsel advised that, the morning after the motions hearing, he and Irwin's counsel reached out to the circuit court, and he advised that the circuit court could enter summary judgment and that the Estate would appeal. Irwin has not disputed these accounts of the teleconference.

On October 17, 2019, the day after the teleconference, the circuit court issued an order, granting the motion *in limine* on the basis that the testimony of Dr. Longo as to the eBay samples of Strait-Line marking chalk was inadmissible and the samples themselves were inadmissible due to a lack of established authenticity. In the order, the circuit court denied Irwin's motion to strike Dr. Longo's testimony as moot.

In a separate order issued on the same day, the circuit court granted the motion for summary judgment and dismissed all pending claims against Irwin. Specifically, the circuit court stated in the order in one sentence that after "determining Defendant Irwin's contemporaneous Motion *in limine* with relevant motion papers, for reasons stated and otherwise appearing in the record upon the parties' oral arguments on October 15, 2019,"

- 14 -

the motion for summary judgment was granted and all pending claims against Irwin were dismissed.

On November 12, 2019, the Estate filed a notice of appeal.

**Opinion of the Court of Special Appeals[5]**

On September 1, 2021, the Court of Special Appeals reversed the grant of the motion *in limine*, vacated the grant of the motion for summary judgment, and remanded the case to the circuit court for further proceedings. See Pifer, 252 Md. App. at 82, 258 A.3d at 893-94. The Court of Special Appeals held that the Estate had demonstrated that there was a reasonable probability that the chalk in the containers bought on eBay was representative of the chalk that Mr. Pifer used. See id. at 78, 258 A.3d at 891. The Court of Special Appeals determined that the appropriate legal standard for determining the authenticity of the samples bought on eBay was set forth in Maryland Rule 5-901(a) as follows: "The requirement of authentication or identification as a condition precedent to the admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Id. at 67, 258 A.3d at 885. The Court of Special Appeals pointed out that under the Rule, "[c]ircumstantial evidence, such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it claims to be[,]" "is an illustration of authentication or identification

---

[5]On July 21, 2021, the Court of Special Appeals issued an unreported opinion. See Christine Pifer, et al. v. Irwin Indus. Tool Co., No. 1849, Sept. Term, 2019, 2021 WL 3076855 (Md. Ct. Spec. App. July 21, 2021). On August 9, 2021, the Estate filed a Motion to Designate Opinion for Reporting. On August 13, 2021, Irwin filed an opposition. On September 1, 2021, the Court of Special Appeals issued an order granting the motion, withdrawing the unreported opinion, and refiling it as a reported opinion.

conforming with the requirements of the Rule." Id. at 67, 258 A.3d at 885. The Court of Special Appeals resolved the dispute between the parties as to the amount of proof required to satisfy the standard by reiterating that the proponent of the evidence must show that there is a "reasonable probability" that the evidence is what the proponent claims it to be. Id. at 72, 258 A.3d at 888.

The Court of Special Appeals concluded that the circuit court erred in reasoning that, for the containers to be admissible, the Estate needed to establish an unbroken chain of custody. See id. at 78, 258 A.3d at 891. The Court of Special Appeals stated that "[t]here is no doubt that the law requires a party to establish a chain of custody when offering certain items of evidence, in order to assure that the particular item is in substantially the same condition as it was when it was seized." Id. at 74, 258 A.3d at 889 (cleaned up). Recognizing that "the stakes are very different here than in a criminal case[,]" the Court of Special Appeals determined that where evidence may be subject to tampering, a chain of custody may be used to establish sameness, i.e., a reasonable probability that the evidence is what it purports be, but where there is no evidence of a motive to alter or tamper with evidence, any gaps in a chain of custody "can go to the weight rather than admissibility." Id. at 74-75, 258 A.3d at 889.

The Court of Special Appeals concluded that the Estate had established a reasonable probability that the exemplars bought on eBay are what the Estate claims them to be. See id. at 75, 258 A.3d at 889-90. The Court of Special Appeals observed that, among other things, it was undisputed that the containers at issue were Irwin's, that noncommercial amphibole asbestos is regulated and not easily found, that the overwhelming majority of

- 16 -

the containers arrived sealed and with no sign of tampering, that each container had chalk matching the color on the label, that most of the chalk tested positive for asbestos, and that the containers with such chalk came from nine sellers in seven states, who, to tamper with them as Irwin claimed, would have needed to intentionally mix the chalk with asbestos, which is regulated and not easy to find. See id. at 75, 258 A.3d at 889-90. The Court of Special Appeals stated that there was no evidence that the Estate, the eBay sellers, or anyone else had a motive to tamper with the containers. See id. at 75, 258 A.3d at 889. The Court of Special Appeals observed that Irwin would be free to make arguments concerning its views about the containers to the jury. See id. at 75, 258 A.3d at 890.

The Court of Special Appeals was unpersuaded by Irwin's contention that the grant of summary judgment was based on grounds other than the grant of the motion *in limine*. See id. at 60, 258 A.3d at 881. The Court of Special Appeals explained that at the conclusion of the motions hearing, the circuit court denied the motion for summary judgment based on the likely admissibility of the container from Mr. Pifer's garage and took under advisement issues such as whether Irwin owed a duty to Mr. Pifer. See id. at 82, 258 A.3d at 893. The Court of Special Appeals stated that a plain reading of the record indicated that the Estate conceded, and the circuit court accepted, that if the motion *in limine* were granted, the Estate would have no admissible evidence on which to establish that summary judgment was unwarranted. See id. at 82, 258 A.3d at 893. The Court of Special Appeals concluded that it would not be inclined to infer from the record that the circuit court had ruled in Irwin's favor on "specific theories" of summary judgment and remanded the case to the circuit court for further proceedings. Id. at 82, 258 A.3d at 893.

**Petition for a Writ of *Certiorari***

On October 15, 2021, Irwin petitioned for a writ of *certiorari*, raising the following two issues:

> 1. Whether it was reversible error for the [Court of Special Appeals] to reverse the authenticity threshold applied by the Circuit Court for the admissibility of items purchased from the internet.

> 2. Whether it was reversible error for the [Court of Special Appeals] to ignore the alternative grounds for summary judgment encompassed in the Circuit Court's Order.

On December 8, 2021, we granted the petition. See Pifer, 476 Md. 584, 264 A.3d 1283.

## DISCUSSION

### I. Authentication

### A. The Parties' Contentions

Before this Court, Irwin contends that the circuit court thoughtfully handled the question of what is required under Maryland Rule 5-901 for the authentication of items purchased on the internet for use as exemplar evidence. According to Irwin, the circuit court recognized that determining whether such evidence is sufficiently authenticated requires a "totality of the circumstances analysis" and that in ruling that the Estate had failed to sufficiently establish the authenticity of the samples, the circuit court weighed a variety of factors including, among other things, the nature of the product at issue and the circumstances of the internet purchases. Irwin argues that, in reversing, the Court of Special Appeals substituted its judgment for the circuit court's, usurped the circuit court's discretion to determine the authenticity of goods purchased on the internet, and lowered the bar for authenticating online purchases. Irwin argues that, under the Court of Special

- 18 -

Appeals's holding, items purchased online are authenticated as long as they "look like what the sellers say they are." Irwin asserts that as a result, trial courts no longer have discretion in determining the authenticity of such evidence and that the Court of Special Appeals's decision must be reversed to keep unregulated materials purchased on the internet out of evidence in civil and criminal cases.

Irwin acknowledges that for authentication under Maryland Rule 5-901, the quantum of required evidence is lower than that necessary for a determination of fact by a jury. Irwin contends, though, that where the evidence at issue is subject to the possibility of tampering or commingling, the bar for authentication is higher, and there must be evidence to negate the risk that tampering has occurred. Citing Griffin v. State, 419 Md. 343, 19 A.3d 415 (2011), Irwin asserts that "[d]ue to the susceptibility of social media evidence to tampering, this Court determined that 'a greater degree of authentication' was required" and indicated that the most obvious way to authenticate evidence susceptible to tampering is through the testimony of a witness with knowledge that the evidence is what it purports to be.

In addition, Irwin contends that the way to negate the possibility of tampering or alteration of evidence is to establish a detailed chain of custody and that the concept of establishing a chain of custody is not limited to criminal cases. Irwin asserts that the circuit court properly relied on Best, 79 Md. App. 241, 556 A.2d 701, in finding that the Estate was required to establish a chain of custody. Irwin argues that the circuit court's ruling is warranted not only by Best and other cases concerning the need to establish a chain of custody, but also by cases involving authentication of social media evidence, which,

- 19 -

according to Irwin, demonstrate that evidence obtained from the internet is particularly vulnerable to tampering. Irwin asserts that in this case there was insufficient circumstantial evidence to establish the authenticity of the items purchased on eBay and that the circuit court's determination was entitled to deference under the abuse of discretion standard.

The Estate responds that the Court of Special Appeals properly held that the circuit court erred in failing to consider whether a reasonable juror could find that the circumstantial evidence proffered was sufficient to authenticate the items purchased on eBay and by requiring the Estate to establish a chain of custody dating back to when the items left the factory. The Estate contends that regardless of whether the evidence at issue is a document, information from social media, items purchased on eBay, or any other type of evidence, it is authenticated where a reasonable juror could find by a preponderance of the evidence that the evidence is what it purports to be. The Estate argues that establishing a chain of custody from the time of manufacture was not required to authenticate the containers and that the containers were sufficiently authenticated through "a body of circumstantial evidence from which a reasonable jury could have concluded, more likely than not, that the marking chalk procured from eBay and analyzed by Dr. Longo was, in fact, Irwin Strait-Line marking chalk." The Estate maintains that Irwin's authenticity challenges go to the weight to be given the evidence rather than its admissibility.

## B. Standard of Review

Generally, an appellate court reviews for abuse of discretion a trial court's determination as to whether evidence is admissible. See Brown v. Daniel Realty Co., 409 Md. 565, 601, 976 A.2d 300, 321 (2009); Dehn v. Edgecombe, 384 Md. 606, 628, 865

A.2d 603, 616 (2005); Farley v. Allstate Ins. Co., 355 Md. 34, 42, 733 A.2d 1014, 1018 (1999). More specifically, an appellate court reviews for abuse of discretion a trial court's determination as to whether evidence was sufficiently authenticated. See State v. Sample, 468 Md. 560, 588, 228 A.3d 171, 189 (2020); Sublet v. State, 442 Md. 632, 676, 113 A.3d 695, 721 (2015); Griffin, 419 Md. at 357, 19 A.3d at 423; Dep't of Pub. Safety & Corr. Servs. v. Cole, 342 Md. 12, 26, 672 A.2d 1115, 1122 (1996).

### C. Maryland Rule 5-901 and Case Law on Authentication of Social Media Evidence

Maryland Rule 5-901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Maryland Rule 5-901(b) includes a nonexclusive list of ways to authenticate evidence. Under Maryland Rule 5-901(b)(4), evidence can be authenticated through "[c]ircumstantial evidence, such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it is claimed to be."

In three criminal cases, we have addressed whether social media evidence was sufficiently authenticated under Maryland Rule 5-901(b)(4) using circumstantial evidence. See Griffin, 419 Md. at 357, 19 A.3d at 423-24; Sublet, 442 Md. at 672, 113 A.3d at 719; Sample, 468 Md. at 565, 228 A.3d at 174. In Griffin, 419 Md. at 357, 19 A.3d at 423-24, we concluded that a trial court abused its discretion in admitting printouts that were purportedly of the defendant's girlfriend's MySpace profile, as the printouts had not been sufficiently authenticated as the girlfriend's through circumstantial evidence under

- 21 -

Maryland Rule 5-901(b)(4).  In Griffin, 419 Md. at 363, 19 A.3d at 427, we refrained from establishing a bright-line test for the authentication of social media evidence.  Instead, we identified ways in which social media evidence could be authenticated, such as through testimony of a person with knowledge (for example, the purported author of a post or message), searching the device of the person who allegedly made the post or profile at issue to determine whether the device was used to create the profile or posting, or obtaining information directly from the social media company that would link the profile or posting to the person who created it.  See id. at 364, 19 A.3d at 428.

At trial, the State had attempted to introduce printouts of the defendant's girlfriend's MySpace page to establish that the girlfriend had threatened a State's witness.  See id. at 348, 19 A.3d at 418.  The State did not question the defendant's girlfriend about the printouts but rather attempted to authenticate the printouts with testimony of its investigator.  See id. at 348, 19 A.3d at 418.  We noted that the State did not try to authenticate the documents through testimony from a witness with knowledge, i.e., the girlfriend, and concluded that there was insufficient circumstantial evidence to authenticate the printouts.[6]  See Griffin, 419 Md. at 357, 19 A.3d at 423-24.  We expressly stated that our holding did not mean that social media websites would never be admissible and suggested various methods for authenticating such evidence.  See id. at 364, 19 A.3d at

---

[6]We determined that the State failed to sufficiently authenticate the printouts at issue through circumstantial evidence under Maryland Rule 5-901(b)(4), as the printouts' inclusion of the defendant's girlfriend's date of birth, the town in which she lived, and a photograph of her did not sufficiently indicate that the girlfriend created the profile or wrote the post that the State sought to introduce into evidence.  See Griffin, 419 Md. at 357, 19 A.3d at 423-24.

- 22 -

428.

In <u>Sublet</u>, 442 Md. at 678, 113 A.3d at 722, in an opinion that consolidated three cases, we adopted the "reasonable juror" test used by most United States Courts of Appeal for authentication of social media evidence. In doing so, we focused on <u>United States v. Vayner</u>, 769 F.3d 125 (2d Cir. 2014), in which the Second Circuit, quoting Federal Rule of Evidence 901, observed that, "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." <u>Sublet</u>, 442 Md. at 664, 666, 113 A.3d at 714-15. We explained that in <u>Vayner</u>, the Second Circuit determined that "this requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." <u>Sublet</u>, 442 Md. at 666, 113 A.3d at 715 (quoting <u>Vayner</u>, 769 F.3d at 129-30) (cleaned up). In <u>Sublet</u>, we put into effect the reasonable juror test and held that social media evidence is authenticated where a trial court determines that a reasonable juror could find that the evidence is what the proponent claims it to be.

Completing the trilogy, in <u>Sample</u>, 468 Md. at 567-68, 228 A.3d at 176, we concluded that the standard of proof that applies to the "reasonable juror" test is the preponderance of the evidence, *i.e.*, the more likely than not standard, and we reiterated that under Maryland Rule 5-901(b)(4), social media evidence may be authenticated through the use of circumstantial evidence. We explained that, as to the authentication of posts on social media through circumstantial evidence under Maryland Rule 5-901(b)(4), "'the inquiry is context-specific,'" and the presence or absence of particular information is not necessarily dispositive. <u>Id.</u> at 599, 228 A.3d at 195 (quoting <u>Sublet</u>, 442 Md. at 676-77,

113 A.3d at 721) (brackets omitted). We stated that when attempting to authenticate social media evidence, the proponent "'need not rule out all possibilities that are inconsistent with authenticity, or prove beyond any doubt that the social media evidence is what it purports to be.'" Sample, 468 Md. at 599, 228 A.3d at 195 (quoting Sublet, 442 Md. at 666, 113 A.3d at 715) (brackets omitted).

### D. The Applicable Standard in This Case

Upon consideration of Maryland Rule 5-901 and relevant authorities, we conclude that the "reasonable juror" test applies to authentication of the eBay samples, *i.e.,* items purchased on the internet, and we hold that the samples purchased on eBay were authenticated under Maryland Rule 5-901(a) because there was sufficient circumstantial evidence for a reasonable juror to find by a preponderance of the evidence that the powder within the containers was Strait-Line marking chalk. Just as we have previously applied the "reasonable juror" test to the authentication of social media evidence, our case law leads to the conclusion that the test applies with equal force to the authentication of exemplar or sample evidence purchased on the internet on websites such as eBay. Evidence is authenticated where a reasonable juror could find, by a preponderance of the evidence, that the evidence is what the proponent claims. See Sample, 468 Md. at 597-98, 228 A.3d at 194-95. Further, circumstantial evidence that the offered evidence is what it is claimed to be may be sufficient for authentication, including authentication of sample or exemplar evidence. See Maryland Rule 5-901(b)(4).

As explained above, in Sublet, we joined other state and federal courts that have utilized the reasonable juror standard for authentication of social media evidence as set

forth by the Second Circuit in Vayner.  See Sublet, 442 Md. at 671, 113 A.3d at 718.  In

Sublet, we noted that, in Vayner, the Second Circuit stated that the requirement to

authenticate evidence "is satisfied if sufficient proof has been introduced so that a

reasonable juror could find in favor of authenticity or identification."  Id. at 666, 113 A.3d

at 715 (quoting Vayner, 769 F.3d at 129-30) (internal quotation marks omitted).  In Vayner,

in making this statement, the Second Circuit quoted United States v. Pluta, 176 F.3d 43,

49 (2d Cir. 1999).  See Sublet, 442 Md. at 666, 113 A.3d at 715.  In Pluta, 176 F.3d at 49,

in 1999, the authentication of passports was at issue, not social media evidence.  The use

of the "reasonable juror" test in Pluta predated the widespread use of social media and

indicates that the test was not developed to apply solely to evidence derived from social

media.[7]  We see no valid reason to cabin the application of the "reasonable juror" test to

social media evidence and to require a heightened or different standard of authentication

---

[7]Although Six Degrees, which "is widely considered to be the very first social networking site[,]" was launched in 1997, social networks were limited at the time and "[i]t would be a few years before the Internet's infrastructure could catch up with the concept of social networks."  Chenda Ngak, *Then and now: a history of social networking sites*, CBS News (July 6, 2011), https://www.cbsnews.com/pictures/then-and-now-a-history-of-social-networking-sites/ [https://perma.cc/JVV8-B5RS].  It was not until the early 2000s that many social media sites began springing up, including LinkedIn in May 2003, MySpace in August 2003, and Facebook in February 2004.  See id.  According to Merriam-Webster, the first known use of the term "social media" occurred in 2004.  See *Social Media*, Merriam-Webster, https://www.merriam-webster.com/dictionary/social%20media [https://perma.cc/K7GT-GYGH].  According to the Pew Research Center, the Center "began systematically tracking social media usage in 2005."  Andrew Perrin, *Social Media Usage: 2005-2015*, Pew Research Center (Oct. 8, 2015), https://www.pewresearch.org/internet/2015/10/08/social-networking-usage-2005-2015/ [https://perma.cc/36UJ-UEAK].  In 2005, only 7% of American adults reported using social networking sites.  See id.  By October 2015, that percentage drastically rose, with 65% of American adults surveyed reporting that they used social networking sites.  See id.

for goods purchased over the internet.[8]

As to the method or amount of proof required to satisfy the standard for authentication if evidence is susceptible to tampering, contrary to Irwin's contention, in Griffin, this Court did not require direct testimony of a witness with knowledge for authentication of social media evidence where there was an allegation that the evidence was susceptible to tampering. In Griffin, 419 Md. at 363-64, 19 A.3d at 427-28, where the State's attempt to authenticate social media evidence through circumstantial evidence failed, we explained that social media evidence could be authenticated in different ways, including through the testimony of a witness with knowledge, but we in no way imposed such a requirement. Similarly, direct testimony is not a prerequisite for authentication of sample evidence purchased on the internet. Indeed, imposing such a requirement would be inconsistent with the plain language of Maryland Rule 5-901(b)(4), which provides that evidence may be authenticated through the use of circumstantial evidence.

Further, our holding in Sample demonstrates that there is no basis for applying a heightened standard of proof where a party seeks to authenticate social media evidence

---

[8]This conclusion is consistent with our discussion of authentication in Jackson v. State, 460 Md. 107, 110, 188 A.3d 975, 977 (2018), in which we held that bank statements and a compact disc with recordings from surveillance cameras were authenticated. In summarizing relevant law, we stated that, "[a]lthough 'any authenticity determination is context-specific,' a trial judge need only 'determine that there is proof from which a reasonable juror could find that the evidence is what the proponent claims it to be.'" Id. at 122, 188 A.3d at 984 (quoting Sublet, 442 Md. at 678, 113 A.3d at 722) (brackets omitted). Although we were not called upon to apply the "reasonable juror" test in Jackson, our observation concerning the applicability of the standard, made in a case not involving social media evidence, is yet another indication that the "reasonable juror" test is not limited to authentication of social media evidence.

through circumstantial evidence under Maryland Rule 5-901(b)(4). In <u>Sample</u>, 468 Md. at 567-68, 228 A.3d at 176, we held that the preponderance of the evidence is the applicable standard of proof for authenticating social media evidence. Just as a heightened standard of proof does not apply to authentication of social media evidence, a heightened standard is not applicable to authenticating goods bought online.[9]

Irwin raises a red herring in contending that a heightened standard of authentication is warranted because the samples purchased were susceptible to the risk of alteration or tampering. Irwin alleges that it is possible that the containers could have been opened and the contents altered at some point after the containers left its factory and makes much of the circumstance that there is no information about the eBay sellers. Irwin argues that it is possible that the eBay sellers, knowingly or not, provided goods that had been altered or tampered with.

From our perspective, although eBay is a relatively new potential source of evidence, buying products secondhand from unknown individuals to offer in court as exemplars is not novel. Apart from the use of the internet, a plaintiff in a case similar to this one could seek to purchase products by placing advertisements in newspapers, putting up posters in neighborhoods, or otherwise soliciting members of the general public to sell products. Under such circumstances, although the plaintiff would not necessarily be able

---

[9]We do not wish, of course, to discourage litigants in future cases from gathering information about online sellers and their products. Information from online sellers concerning where or how a product was acquired, what was known about the product before it came into the seller's possession, and how a product was stored or maintained could be considered by a trial court in making a determination as to authentication. That said, such information is not an indispensable prerequisite to authentication.

to vouch for the sellers of the product or identify the origin of the item prior to it coming into the seller's possession, Maryland Rule 5-901 and the reasonable juror test would nonetheless apply for authentication.  See Jackson v. State, 460 Md. 107, 122, 188 A.3d 975, 984 (2018) ("Although any authenticity determination is context-specific, a trial judge need only determine that there is proof from which a reasonable juror could find that the evidence is what the proponent claims it to be."  (Cleaned up)).

### E.  The Circuit Court's Ruling: Chain of Custody

The circuit court's determination that the containers were not authenticated because the Estate failed to establish a chain of custody constituted an abuse of discretion, as the ruling was grounded on the premise that establishing a chain of custody was a requirement for authentication of the samples.  At the conclusion of the motions hearing, in ruling on the motion *in limine*, among other things, the circuit court stated:

> In product liability cases, such as the one that we have here, it is the plaintiff who bears the burden of establishing, among other  things, that first the product was in defective  condition at the time it left the possession or control of the seller.  And next pertinent to  this case the product was expected to and did  reach the consumer without substantial change in its condition. That's a paraphrase certain of the elements that inform us in Phipps v. GM. The cite for Phipps which was the critical case drawing in the application of Restatement Second Tort Section 402(a) is 278 Maryland 337.  That was back in 1976.  A reliable chain of custody is of the utmost importance for authentication purposes where evidence is susceptible to tampering or commingling or  alteration of some sort.  That's a paraphrase out of Best v. State, 79 Md App 241 at page 250 in 1989.

> \* \* \*

> The defendant has identified a number of  ways in which plaintiff has failed to meet the authentication burden.  And I agree with just about every one of those circumstances.  The chain of custody spanning several decades is unestablished.  The absence of any affidavits, any hint of previous owners

using chalk or possessing the chalk for any purpose, or selling the chalk in any condition, it's just not existent.

* * *

Finding that the samples are authentic would require that I take nothing short of, quote/unquote, leap of faith. I hearken back to <u>Best v. State</u> case for that. The plaintiff is providing me with incomplete chains of custody. Plaintiff cannot account for the fact that at a minimum it's a 36-year gap between when the samples were manufactured and when they were purchased on eBay. I find that the plaintiffs have failed to make the requisite showing under 5-901. And I've gone one step further and find that I can't let the samples in.

(Underlining added) (some paragraph breaks omitted).

Instead of applying the "reasonable juror" test, the circuit court reasoned that the samples were not authenticated because the Estate had not established a chain of custody starting from when Irwin manufactured the containers decades ago. The circuit court cited <u>Best</u>, 79 Md. App. 241, 556 A.2d 701, in support of the proposition that the Estate was required to establish such a chain of custody. On brief in this Court, in addition to citing <u>Best,</u> Irwin relies on the cases of <u>Amos</u>, 42 Md. App. 365, 400 A.2d 468, and <u>Jones</u>, 172 Md. App. 444, 915 A.2d 1010, for the proposition that, to authenticate the items purchased on eBay, the Estate was required to establish a chain of custody dating back to when Irwin manufactured the containers.

We disagree. The Estate was not required to establish a chain of custody dating back to Irwin's manufacturing of the samples to establish that a reasonable juror could find by a preponderance of evidence that the samples purchased on eBay were what they purported to be. In <u>Best</u>, 79 Md. App. at 248, 556 A.2d at 704, a criminal case involving a controlled dangerous substances prosecution, the defendant alleged that the State failed

- 29 -

to prove a sufficient chain of custody as to both marijuana and cocaine. In rejecting the defendant's claim, the Court of Special Appeals stated that "[t]he basic rule with respect to the reception of physical or 'real' evidence" was described in Amos, 42 Md. App. at 370, 400 A.2d at 471, stating:

> To be admissible 'real evidence' must be in substantially the same condition that it was in at the time of the crime and must be properly identified. Although there is a natural inference or presumption of continuance in the same condition, that inference varies in each case with the nature of the subject matter and the time element.

Best, 79 Md. App. at 250, 556 A.2d at 705 (quoting Amos, 42 Md. App. at 370, 400 A.2d at 471) (ellipses omitted). In Best, 79 Md. App. at 250, 556 A.2d at 705, the Court of Special Appeals explained that whether "real evidence" is in the same condition as at the time of the crime need only be proven as a reasonable probability and that proof negating the probability of changed conditions is described as proving the chain of custody. (Citation omitted). The Court of Special Appeals stated that "what is necessary to negate the likelihood of tampering or of change of condition will vary from case to case and from one type of evidence to the next." Id. at 250, 556 A.2d at 706. The Court of Special Appeals explained that controlled substances would possibly be more vulnerable to tampering or commingling than other types of evidence and that with respect to controlled dangerous substances, the General Assembly had enacted a statute to assist with proof of chain of custody. See id. at 250-51, 556 A.2d at 706.

The principle that the State must establish a chain of custody as to its possession of controlled dangerous substances is governed by Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) ("CJ") § 10-1002. The statute sets forth a method of establishing a chain

of custody as to controlled dangerous substances "in a criminal or civil proceeding[.]"  CJ § 10-1002(b)(1).  For purposes of CJ § 10-1002, the term "'[c]hain of custody' means: (i) The seizing officer; (ii) The packaging officer, if the packaging officer is not also the seizing officer; and (iii) The chemist or other person who actually touched the substance[.]"  CJ § 10-1002(a)(1) (paragraph breaks omitted).  CJ § 10-1003(a)(1) provides: "In a criminal proceeding, the prosecution shall, upon written demand of a defendant filed in the proceedings at least 5 days prior to a trial in the proceeding, require the presence of the chemist, analyst, or any person in the chain of custody as a prosecution witness."  CJ § 10-1003(a)(2) provides: "The provisions of [CJ] §§ 10-1001 and 10-1002 [] concerning prima facie evidence do not apply to the testimony of that witness."

In <u>Amos</u>, 42 Md. App. at 369-70, 400 A.2d at 471, where the State sought to substantiate testimony that the sale of drugs to an undercover trooper took place, the State attempted to corroborate the testimony of the trooper by introducing into evidence the drugs that were allegedly sold, *i.e.*, "the real evidence" of the crime.  The Court of Special Appeals explained that "[t]o be admissible, however, this 'real evidence' must be in substantially the same condition that it was in at the time of the crime and must be properly identified."  <u>Id.</u> at 370, 400 A.2d at 471 (citation omitted).  The Court explained that:

> Obviously, the identifying guarantee that the hard evidence seized is unchanged between the time of seizure and the trial is not as important as establishing that the thing seized is the same analyzed and introduced at the trial as a proscribed drug.  When drugs are submitted to police laboratories for analysis and held in drug lockers with "say two hundred (other specimens) to be tested," there is far greater risk of misidentification than there is of changed conditions.

<u>Id.</u> at 370-71, 400 A.2d at 471-72.

In Jones, 172 Md. App. at 463, 915 A.2d at 1021, in a sexual assault case, the Court of Special Appeals held that the State's evidence regarding the chain of custody of DNA evidence obtained from the victim indicated there was a reasonable probability that the evidence had not been tampered with and was substantially the same as when it had been collected. In Jones, id. at 462, 915 A.2d at 1021, the defendant alleged that the State's chain of custody evidence did not establish by a reasonable probability that a DNA swab of the victim was in substantially the same condition when it was tested as when the crime occurred because, among other things, according to the defendant, the DNA evidence was not timely collected. In resolving the issue, the Court of Special Appeals explained that the proponent of a particular piece of evidence must account for its handling from the time that it was seized until the time it is offered into evidence. See id. at 463, 915 A.2d at 1021.

In Wheeler v. State, 459 Md. 555, 557-58, 569, 187 A.3d 641, 643, 650 (2018), in a controlled dangerous substances case, where the defendant had invoked the right to have all witnesses in the chain of custody produced pursuant to CJ § 10-1003 and argued that the absence of the packaging officer should have resulted in exclusion of the controlled dangerous substance at trial, we held that the trial court did not abuse its discretion in admitting the evidence and that Maryland Rule 5-901 requires only that there be sufficient authentication to satisfy a finding that the evidence is what it purports to be. In Wheeler, id. at 569-70, 187 A.3d at 649-50, we concluded that the State established a chain of custody as to controlled dangerous substances through the officer who seized the drugs and the chemist who tested them, without the presence of the packaging officer. We explained

that for purposes of Maryland Rule 5-901, demonstrating that an item was in substantially the same condition as when seized need only be proven as a reasonable probability. See id. at 567, 187 A.3d at 648.

Our case law demonstrates that a chain of custody as to controlled dangerous substances or a DNA sample in a criminal case starts with the seizing officer, not with the individuals who made or manufactured the drugs or anyone who may have handled the evidence before it came into the possession of the officer who collected it. Although the proof negating the probability of changed conditions between the crime and the trial is described as proof of the chain of custody, the State is required to establish a chain of custody from the point at which evidence is collected or seized, not from the precise moment of the crime. In neither Wheeler nor Cooper was the State required to prove, as a condition precedent to authentication, what occurred with the evidence before an officer took possession of it. Any alleged variance in the condition of the evidence between the time of the crime and the State having collected it would go to the weight to be accorded the evidence by the trier of fact, not admissibility.

Insofar as negating the possibility of tampering is concerned, there is no hard and fast requirement that in a civil case where the issue of tampering is raised or where a substance may be susceptible to tampering, the proponent of the offered evidence is required to establish a chain of custody for the evidence to be admissible. To be sure, demonstrating a chain of custody for evidence that a party seeks to have admitted is one way to demonstrate that the offered evidence is what it claims to be or is in the same condition that it was at the time that it came into the party's possession or at an earlier

relevant point. But, in the end, authentication of evidence under Maryland Rule 5-901 depends on a showing that a reasonable juror could find by a preponderance of the evidence that the item at issue is what it is claimed to be, *i.e.*, that there was sufficient evidence of a reasonable probability to establish that the item is what it purports to be.

**F. The Estate Met its Burden to Prove that the Containers were Authentic**

In this case, the Estate met its burden to establish that the containers purchased on eBay were authenticated as there was sufficient circumstantial evidence for a reasonable juror to find that it was more likely than not that the powder in the containers was Strait-Line marking chalk. Indeed, much like <u>Sample</u>, 468 Md. at 567, 228 A.3d at 176, this case serves as an example of authentication through circumstantial evidence under Maryland Rule 5-901(b)(4). The Estate sought to have admitted as exemplars of Strait-Line marking chalk nineteen containers purchased on eBay and the powder within the containers. Viewed as a whole, the evidence was sufficient for a reasonable juror to conclude that it was more likely than not that the powder within the containers was chalk manufactured by Irwin. It is undisputed that Irwin made the containers, *i.e.*, that the containers were Irwin's. It is also undisputed that the contents or powder within each container matched the color designated on the label of the container.

It is equally undisputed that the samples that tested positive for asbestos were purchased from eBay sellers in various different cities in different states. And, the contents of the containers tested positive for noncommercial amphibole asbestos, which is regulated and not readily available. The significance of this circumstance was aptly described by the Court of Special Appeals. The Court of Special Appeals stated that to have tampered with

the contents of the containers, as Irwin alleges, the owners "would have had to lace the Irwin chalk exemplars with asbestos intentionally[.]" Pifer, 252 Md. App. at 75, 258 A.3d at 889. The Court of Special Appeals observed that "[t]he Estate argued, and Irwin didn't counter, that it is unlikely that the previous owners of the exemplars would have intentionally found and laced the samples with noncommercial amphibole asbestos[.]" Pifer, 252 Md. App. at 76-77, 258 A.3d at 890.

Irwin does not dispute that the powder within the containers tested positive for noncommercial amphibole asbestos but contends that the Estate offered no evidence to support a finding that calcium carbonate can be contaminated with asbestos fibers. Irwin contends that its chalk contained calcium carbonate but not asbestos. Irwin's contention about whether calcium carbonate can become contaminated with asbestos would be a determination to be made by the trier of fact. The circumstance that multiple containers, obtained from sellers in cities in different states, had powder that tested positive for noncommercial amphibole asbestos is, as the Court of Special Appeals determined, circumstantial evidence to be considered for purposes of authenticity.

An additional circumstance that supports a finding of authentication is that seventeen of the nineteen containers at issue were sealed when received by the Estate's counsel and sixteen of eighteen containers that bore the label Irwin Augur Bit Company were sealed. Irwin argued that the containers were susceptible to tampering and were designed to be refilled and that, as a result, the contents of the containers could have been altered. The Estate addressed this point, though, by contending that only the ketchup bottle (the container found in Mr. Pifer's garage) was intended to be refilled. Of the nineteen

containers at issue, fifteen were one-ounce containers and the remaining four were half-pound cans, which the Estate contended were not intended to be refilled. The Estate showed that a metal spatula or razorblade was required to pry or cut off the cap of fourteen of the fifteen one-ounce containers. Similarly, with regard to three of the four half-pound cans, tape needed to be removed and a metal spatula or razorblade was required to pry open the pour spout.

The Court of Special Appeals noted that it was possible that, in the abstract, the containers could be susceptible to tampering, but observed that there was no evidence of tampering beyond Irwin's hypothesis. See id. at 75, 258 A.3d at 889. We recognize that Irwin contends that Dr. Longo's testimony fell short of establishing that the containers were factory sealed and that they had never been opened or refilled. It would strain credulity, though, to accept the notion that, in seventeen separate instances occurring across the country, a factory-sealed container of Strait-Line marking chalk was opened, emptied, refilled with a different kind of chalk contaminated with noncommercial amphibole asbestos, and resealed.

Together, all of the above circumstances provide more than sufficient circumstantial evidence for a reasonable juror to find by a preponderance of the evidence that the powder within the containers was Strait-Line marking chalk. We agree with the Court of Special Appeals that "[b]y requiring the Estate to prove the negative, i.e., an unbroken chain of custody from the factory and the absence of tampering, the trial court required more than a reasonable probability that the samples are exemplars of the chalk Mr. Pifer used[.]" Pifer, 252 Md. App. at 78, 258 A.3d at 891. Far from usurping the role of the circuit court

as the gatekeeper of evidence (as alleged by Irwin), the Court of Special Appeals correctly recognized that, by excluding the evidence in this case, the circuit court exceeded the requirements for authentication of Maryland Rule 5-901 and our case law. See Pifer, 252 Md. App. at 60, 258 A.3d at 880-81.

## II. Summary Judgment

Irwin contends that the circuit court's grant of summary judgment was based on grounds other than the exclusion of the containers bought on eBay and that the Court of Special Appeals erred in not considering the additional grounds. Irwin argues that, where the scope of an order granting summary judgment is unclear, the Court of Special Appeals must review all possible grounds on the assumption that the trial court considered all of the grounds. Irwin asserts that this principle promotes finality and judicial economy and is particularly important here, given that the alternative grounds for summary judgment did not involve factual disputes and the circuit court did not have the discretion to deny summary judgment. As to the alternative grounds for summary judgment, Irwin maintains that it did not owe Mr. Pifer a duty to warn and that the Estate cannot establish causation or its strict liability and manufacturing defect claims.

The Estate responds that we should remand the case without addressing grounds for summary judgment that the circuit court did not rely on. The Estate contends that, under relevant case law, when reviewing a grant of summary judgment, this Court considers only the grounds on which the trial court relied.

There is a well-established "general rule that in appeals from the granting of a motion for summary judgment, absent exceptional circumstances, Maryland appellate

courts will only consider the grounds upon which the lower court granted summary judgment[.]" State v. Rovin, 472 Md. 317, 373, 246 A.3d 1190, 1222 (2021) (cleaned up). We have described this principle as follows: "Our review of the trial court's grant of summary judgment is limited ordinarily to the legal grounds relied upon explicitly in its disposition." Baker v. Montgomery Cty., 427 Md. 691, 706, 50 A.3d 1112, 1120 (2012) (citing River Walk Apartments, LLC v. Twigg, 396 Md. 527, 541-42, 914 A.2d 770, 778-79 (2007)).

In this case, it is not clear from the record that the circuit court relied on any ground other than the Estate's concession in granting summary judgment. To address the alternative grounds for summary judgment alleged by Irwin, we would be required to infer from the record that although the circuit court made no specific findings as to the additional grounds, the circuit court nonetheless granted summary judgment as to multiple claims involving complex legal issues. Nowhere in the order granting summary judgment did the circuit court mention any alternative grounds for the grant of summary judgment, let alone indicate that summary judgment was granted for any reason other than the Estate's concession. Although the order stated that the circuit court had "reviewed and considered" the motion for summary judgment, it would be pure speculation to infer from customary "reviewed and considered" language that the circuit court agreed with any of the alternative grounds on which Irwin sought summary judgment.

Indeed, as the Court of Special Appeals explained, a straightforward reading of the record indicates that the grant of the motion for summary judgment was based solely on the exclusion of the containers bought on eBay. See Pifer, 252 Md. App. at 82, 258 A.3d

at 893. Irwin's first argument in the motion for summary judgment was that, if the circuit court granted the motion *in limine*, Irwin would be entitled to summary judgment because there would be no factual predicate for the Estate's claims. At the October 15, 2019 motions hearing, counsel for both parties agreed that the motion *in limine* was dispositive. At the conclusion of the hearing, the circuit court did not indicate how it would rule other than that it denied the motion for summary judgment in pertinent part because the sample from Mr. Pifer's garage was likely admissible. After Irwin's counsel specifically asked whether the circuit court would rule on the alternative grounds, the circuit court responded that it would take the issues under advisement and indicated that it would not be able to issue a ruling before October 22, 2019. The morning after the motions hearing, during a teleconference with the circuit court and counsel for both parties, the Estate's counsel conceded that summary judgment was warranted because, without the containers bought on eBay, it would not have admissible evidence to oppose the motion for summary judgment. The next day, the circuit court issued the order granting summary judgment, which stated that after having determined the motion *in limine*, the court granted summary judgment.

Under these circumstances, it would not be reasonable for us to infer that the circuit court implicitly concluded that the alternative grounds for summary judgment advanced by Irwin were meritorious and granted summary judgment on those grounds without having mentioned doing so. This would be particularly difficult for us to conclude when the circuit court's order granting summary judgment—in light of its ruling on the motion *in limine*—came just two days after the court explicitly stated that it would need at least a week to

consider the summary judgment issues, and the order did not mention any alternative grounds for summary judgment, much less rely on them.

We recognize that the rule against affirming a grant of summary judgment on alternative grounds "is a general rule rather than an absolute one," and that, accordingly, "there are exceptions." Rovin, 472 Md. at 373, 246 A.3d at 1222. "For instance, we have indicated that an appellate court may affirm on a different ground where the trial court would have had no discretion to deny summary judgment as to that ground." Id. at 373, 246 A.3d at 1222-23 (citing Wireless One, Inc. v. Mayor & City Council of Baltimore, 465 Md. 588, 614 n.6, 214 A.3d 1152, 1167 n.6 (2019)); see also Md. Cas. Co. v. Lorkovic, 100 Md. App. 333, 357, 641 A.2d 924, 935 (1994) ("As a general rule, appellate courts will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment." (Cleaned up)). We have applied this exception where "the circuit court could not have arrived at any conclusion other than" the one warranted by the alternative ground for summary judgment. Wireless One, 465 Md. at 614 n.6, 214 A.3d at 1167 n.6. "We have also indicated that an appellate court may affirm on a different ground where the two grounds are so interrelated that they cannot be properly considered as separate and distinct[.]" Rovin, 472 Md. at 373, 246 A.3d at 1222-23 (cleaned up).

In this case, neither of the exceptions is applicable. The alternative grounds on which Irwin sought summary judgment involved, among other things, issues pertaining to the duty to warn and strict liability in product liability cases. We cannot say that the circuit

- 40 -

court could not have reached any conclusion other than finding Irwin's contentions meritorious, *i.e.*, that the circuit court lacked the discretion to deny summary judgment with respect to the alternative grounds for summary judgment. Nor would it be possible for us to address the alternative grounds for summary judgment under a theory that they are somehow intertwined with the circuit court's ruling on authentication of the samples bought on eBay.

In addition to contending that the circuit court lacked the discretion to not grant summary judgment on the alternative grounds that it raised, Irwin relies on cases in which the Court of Special Appeals has stated that, where a trial court grants summary judgment without specifying grounds, an appellate court assumes that the trial court carefully considered all grounds asserted and determined that all, or at least enough, of them had merit. See Greenstein v. Council of Unit Owners of Avalon Ct. Six Condo., Inc., 201 Md. App. 186, 198, 29 A.3d 604, 611 (2011), cert. denied, 424 Md. 291, 35 A.3d 488 (2012); Piscatelli v. Smith, 197 Md. App. 23, 37, 12 A.3d 164, 172 (2011), aff'd, 424 Md. 294, 35 A.3d 1140 (2012); Bond v. NIBCO, Inc., 96 Md. App. 127, 133, 623 A.2d 731, 734 (1993). In Piscatelli, 197 Md. App. at 37, 12 A.3d at 172-73, the Court of Special Appeals stated that, "[u]nder such circumstances, we can affirm the court's judgment if the record indicates that the circuit court did not err." (Citations omitted). In addition, we have stated that, where a trial court does not identify reasons for granting summary judgment, "we will affirm the judgment so long as the record discloses it was correct in so doing." Smigelski v. Potomac Ins. Co. of Illinois, 403 Md. 55, 61, 939 A.2d 189, 193 (2008) (cleaned up).

Our reading of these cases is that where a trial court grants summary judgment

without specifying grounds, an appellate court has the discretion to treat the ruling as being based on some or all of the dispositive issues raised in the motion for summary judgment if the record establishes that the trial court was correct in granting summary judgment. In this case, based on the record and the nature of the issues raised in the alternate grounds for summary judgment, we are unable to make such a determination. This is not a case in which the trial court did not specify a reason for the grant of summary judgment and it could possibly be inferred that the court considered and ruled on all grounds. Rather, a fair reading of the record in this case indicates that after the Estate's concession that it could not defeat summary judgment without the eBay samples, the circuit court's ruling was based solely on the concession.[10] We cannot infer that the circuit court granted summary judgment on all grounds raised in a motion when the record does not support such a determination.

Finally, we are aware that Irwin contends that, at the conclusion of the motions hearing, the circuit court ruled that the affidavit of the Estate's expert, Dr. Longo, was "deficient under Maryland Rule 5-703" and therefore an insufficient basis on which to create "a disputed material fact" for summary judgment purposes. On brief, Irwin asserts that the circuit court found that Dr. Longo's opinion that the containers purchased on eBay were factory sealed was based on his observation of a video of a technician opening the

---

[10]We are unpersuaded by Irwin's counsel's contention at oral argument that affirming the Court of Special Appeals's judgment would essentially provide the Estate with "a backdoor method to get an interlocutory appeal[.]" From our perspective, nothing in the record indicates that the Estate was attempting an end run around the general rule that only final judgments are appealable.

containers and that his opinion was therefore inadmissible under Maryland Rule 5-703.

The Estate responds that Irwin did not argue before the circuit court that Dr. Longo's

affidavit failed to satisfy Maryland Rule 5-703 and that, to the extent that the circuit court's

grant of summary judgment relied on "a purported 5-703 failure[,]" the circuit court erred.

A review of the record reveals that, in discussing the motion *in limine*, the circuit

court referred to Maryland Rule 5-703, which concerns the basis of an expert's opinion. In

one instance, the circuit court stated:

> In addition to addressing relevant authorities addressing Rule 5-901 and authentication by means of circumstantial evidence, I was compelled to address the requirements the instruction of Rule 5-703 because the way in which the eBay samples in part to be addressed on the request or insistence plaintiffs is through the expert opinion of Longo who says by affidavit explained in his reports that a number of the so-called eBay samples had been obviously, clearly factory sealed, had not been changed in their contents, certainly not in the appearance of the container for the decade since the containers have been filled and put on the market.
>
> 5-703 admonishes me that the facts or data in a particular case on which an expert bases an opinion or an inference may be those perceived by or made known to the expert that or before the hearing. If determined to be trustworthy, necessary to eliminate testimony, and unprivileged, those facts are data reasonably reliable on the expert named discretion of the court disclosed to the jury even if those facts and data are not admissible in evidence.

In another instance, the circuit court stated:

> I'll give essentially Longo the benefit of the doubt about the proper exercise of common sense for such a purpose. By saying that somehow or another he must be relying on his experience to advance the opinion about factory seals. But it doesn't get me where I need to be in order to find that evidence admissible, either under 5-901 or consistent with 5-703.
>
> It is -- I mentioned a number of grounds on which the defendant claims or the defendant argues that the samples are inadmissible, cannot be authenticated.

When ruling on the motion *in limine*, the circuit court stated:

> Based on [D]r. Longo's expert testimony, applying, and relying on the guidance of Rule 2-703.
>
> I go one step further to say that I haven't seen and I believe that plaintiffs have failed to meet their burden to establish the eBay samples themselves are in substantially the same condition as they were at any point in time after they left the defendant's control sometime between 1960 or 1962 and 1982.

It appears that in mentioning Rule 2-703, the circuit court may have intended to refer to Rule 5-703. It is unclear, however, what conclusion, if any, the circuit court reached with regard to Maryland Rule 5-703. Based on this record, we decline to determine that the circuit court ruled that Dr. Longo's testimony was excluded under Maryland Rule 5-703 or that the circuit court issued a ruling under Maryland Rule 5-703 that would impact or affect any of the alternate grounds that Irwin advanced for summary judgment. Moreover, the argument that Dr. Longo could not render an opinion that the containers bought on eBay remained factory sealed because he lacked personal knowledge of what happened to the containers before he received them, or because he watched a video of the containers being opened rather than opening them himself, would not alone constitute grounds for exclusion of the expert's testimony under Maryland Rule 5-703(a), which provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."

For all the reasons expressed herein, we affirm the judgment of the Court of Special Appeals and the remand ordered by that Court.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/49a21cn.pdf